10 N.J. 23 (1952)
89 A.2d 416
IN THE MATTER OF THE PRESENTMENT MADE TO THE SUPERIOR COURT OF NEW JERSEY, CAMDEN COUNTY, BY THE CAMDEN COUNTY GRAND JURY ON OR ABOUT OCTOBER 11, 1951. J. JAMES HAINSWORTH, JR., MOVANT-APPELLANT.
The Supreme Court of New Jersey.
Argued March 24, 1952.
Decided June 16, 1952.
*26 Mr. Frank G. Schlosser argued the cause for the movant-appellant.
Mr. Mitchell H. Cohen, Prosecutor of Camden County, argued the cause for the State.
The opinion of the court was delivered by VANDERBILT, C.J.
The matters involved in this appeal are so vital to the sound administration of justice, and some of them are so widely misapprehended that we deem it essential to present the facts and our views of the pertinent principles of law in considerable detail.

I
An attempted jail break by one John Caruso, an inmate of the Camden County jail and a paroled murderer, precipitated a joint inquiry by the appellant as sheriff of Camden County and the county prosecutor into conditions at the jail. The investigation disclosed such serious misconduct in the administration of the jail that the evidence gathered was submitted to the grand jury, which in turn examined 59 witnesses, including the appellant, at 12 special sessions and took 1,500 pages of testimony. On October 11, 1951, as a result of the grand jury investigation indictments for misconduct in office were returned against the undersheriff and three jail guards, and indictments for conspiracy and false swearing were found against the undersheriff, two jail guards and one Joseph Martino, alias Eddie O'Keefe, who, although not a public official or employee, seems to have had the run of the jail almost continuously day and night, even eating and sleeping there.
At the same time the grand jury also presented to the assignment judge of Camden County a lengthy "report" on its investigation of the irregularities at the jail. The document stated that the jury was unanimously convinced that laxity in the Camden County jail had reached deplorable proportions *27 and that indifference to responsibility "from personnel to the top elective office" helped directly in the existence of a "pay-or-else" system, "which was a public safety hazard, a destroyer of the morale of the majority of the prisoners and a mockery of restrictions which should be placed on those who violate our laws." The grand jury enumerated the "irregularities" that existed in the county jail under the following heads:
"`Favored' Prisoners Taken Out  Under the `pay-or-else' system, favored prisoners were taken out of jail and escorted to local restaurants or nearby taprooms. Here they were permitted their choice of foods or liquors. On one occasion, one of these men was returned so drunk that another inmate undressed him and put him in the sick bay. At another time, a prisoner was left unattended for an hour in the Gloucester taproom; still another was taken to a visit to his home with no obvious reason for doing so.
Flagrant Disregard to Scheduled Visiting Hours  By admission of jail personnel (night shift) little, if any, attention was paid to the ruling on visiting hours  which are 1:00 P.M. to 3:00 P.M. on Wednesday afternoons. Laxity of directive officers and indifference of most personnel permitted the `favored' to come and go at will. Visitors often remained until early hours of the morning.
Contact Visits  Because of the same marked shifting of responsibility and indifference, female visitors were permitted contact visits with prisoners with impromptu quarters (including couch) in the guards' dining room. Couples were permitted to be alone for indefinite periods.
Unofficial `Assistant' Undersheriff  The constant presence of Joseph Martino  almost daily and nightly with no reason yet provided for being there  has been definitely established by this Grand Jury. This irregularity has been branded in the Department of Institutions and Agencies' report as `one of the more flagrant abuses and violations of good jail practice.' Martino, as field representative for the `system,' carried keys, ran errands, performed menial tasks as well as directive duties and with obvious permission of the Undersheriff, set himself up as an overseer, and slept and ate in the jail.
Steak and Lobster  Food to order including steaks, chicken, spaghetti, lobster, submarine sandwiches and imported him were among those delicacies brought to prisoners who had the price to pay several times their actual worth. On other occasions special foods were brought by visitors for prisoners and these were prepared in the prison kitchen, to be enjoyed as late-hour `snacks' for the privileged.
Liberal Spending By Prisoners  The sum of $250.00 deposited for one prisoner was all withdrawn by him in less than six weeks' time with as much as $50.00 in a single day received by him. Other prisoners who had accounts were permitted the same privilege. This *28 spending by those who had it was directly responsible for the `pay-or-else' system, the money games, professional card cutters and almost all special favors.
Medical Program  The medical program was lax  and dangerous while a physician is available for prisoners who are ill, he does not visit the jail with sufficient regularity, unless summoned. As a result, prisoners were admitted to the sick bay at the discretion of prison personnel and attended by an inmate-orderly who had permission to take temperatures and dispense medicines and bromides in accordance with the doctor's prescriptions. There was no way to see that correct dispensing was followed out and this permitted the handling of bromides, etc., by irresponsible persons.
Visitors' Book Ignored  The system included no time nor interest in the Visitors' Book. Insistence that this proper practice be followed, with signature of every visitor, along with date and time of visit would have interfered with the `system.'
Abuse of Privilege  The special privilege irregularities as they existed in Camden County Jail, call for strong censure from this jury. It was vicious and shocking. Penal institutions are reserved for all those found guilty of punishable forms of law violation. Restrictive privilege should be applicable to all as a part of the punishment meted out by the decisions of the juries and courts of our land. The existence of the `pay-or-else' system made this a mockery. Prisoners convicted of minor crimes, if they had no money, were compelled to watch more hardened criminals  one a paroled murderer  enjoy relative freedom and comforts because they could afford to pay for these."
Having listed the irregularities, of which the grand jury said it possessed "overwhelming proof," it then proceeded to "determine who was responsible" therefor:
"The Sheriff's disinterest and lack of knowledge of his job, based upon his own admitted testimony before this Grand Jury, rates the strongest kind of moral indictment. Moral only because the laws of the State fail to define clearly his chargeable responsibilities and fix legal penalties upon failure of such elected officials who fail to complete these properly.
The Sheriff, appearing twice before this Grand Jury, admitted that if the irregularities existed in his department they were poor practices  that he had been up in the jail at nights `maybe two, three, four or five times' * * * that he had seen Martino but didn't know who he was (Undersheriff Lombardo and Martino testified that he did know) * * * that he had no idea that such deplorable conditions existed * * * that he had left the jail to his subordinates.
While the Sheriff's testimony convinced the Jury of his general lack of knowledge of what was going on, the Martino angle as far as *29 the Sheriff was concerned is a clear-cut example of the extent of his lack of interest. If he did not know that Martino was a constant visitor even casual attention to his job would have revealed this.
This Jury remains convinced that the Sheriff was a poor witness whose testimony was evasive and lacking in cooperation which an investigating Grand Jury should expect from a public servant who was properly discharging his duties. It is further the final opinion of the Grand Jury that until the commencement of this investigation at least, he had failed miserably in his public trust.
Undersheriff Lombardo, who was appointed by the Sheriff to be in charge of the jail, appeared before this Jury three times; twice at his own request to change damaging testimony which he had made under oath previously. He, in turn, admitted leaving much of the responsibility to his subordinates and Martino, and he admitted some of the irregularities. His resignation, between appearances before the Grand Jury, is significant.
Martino's testimony denying any wrong-doing in the `pay-or-else' system was broken down by the testimony of too many witnesses to be acceptable to the jurors who rate him, with the Undersheriff, as prime instigators.
The Warden who stated that he rarely visited the jail after his hours  from 9:00 A.M. to 4:00 P.M.  said that he was in charge but that when the Undersheriff was on the scene, he became the person in authority.
Jail personnel were apathetic and acceptant of the condition, but a penchant for petty chiseling by several of them, at the expense of prisoners, made them willing partners in the `system.'
How much more money than that which could be placed by evidence exchanged hands or who pocketed it, this Jury cannot state, and it is not within its premise to speculate. Enough to say, that the system which thrived at Camden County Jail, through laxity at the top, and in the middle, caused acceptance at the lower levels, and must have yielded a relatively sizeable return for those involved."
The grand jury's report made a series of specific recommendations for the future conduct of the jail in the following terms:
"That Legislation be enacted giving the State Department of Institutions and Agencies more powers to prescribe basic rules and regulations to be strictly adhered to in the administration of our County Jails. This Legislation should also provide fines or imprisonments for elected or appointed office-holders or any member of jail personnel, found guilty of violations thereof.
That regulations, which would definitely fix responsibilities of the offices of the Sheriff, Undersheriff, Wardens and all jail personnel, be immediately prepared and set forth, so that Grand Juries of the future will be spared the time-wasting and `buck-passing' to which *30 this Jury has been subjected by the above-mentioned officials and personnel.
That prisoners not be permitted to have cash in their possession nor the right to draw from a deposited account. The Jury can offer no better plan than that recommended by the State Department of Institutions and Agencies, to the effect that prisoner-accounts be maintained in fiscal records of the jail, and permitting these prisoners to make credit withdrawals for the purchase of personal essentials available at the jail commissary.
That such merchandise be dispensed from the commissary at proper prices and normal profits ensuing, be used for recreational or morale-building programs for prisoners.
That regulations be immediately set up, establishing definite and limited hours of visitation and that these be adhered to, by the requirement that every visit by everyone be signed in the Visitors' book with date and exact time of arrival and departure and the prisoner visited. Visits at other hours, in times of emergency, might be made but only after someone vested and charged with the responsibility signs official approval.
That all visitors be limited to screen visits, outside the jail blocks, through the screens already built in the Camden Jail for this purpose. Contact visits such as these common in the Camden County Jail, make possible the exchange of weapons, drugs, poisons, and other commodities and so create a dangerous public menace.
That the jail physician visit the jail at least once daily and that prisoners be admitted to the sick bay only upon his signed order and release when he deems it proper. The dangerous custom of permitting inmate-orderlies to serve as male nurses and to handle any medicine, or have access to the medicine chest should not ever be permitted. A member of the Jail personnel should be made responsible for any non-professional assistance required.
That all special privileges be eliminated except in cases of rare emergency, and then only when a person, chargeable for the responsibility, officially approves such action.
That such `irregularities' as: the removal of prisoners for special visits outside of the jail, contact visits with prisoners, money card games, presence of unauthorized personnel, admission to the jail of uninspected food or packages from outside be permanently eliminated.
That all such acts which are labeled as `improper and poor practice' by the State Department as well as recommendations considered proper practice, be listed and posted currently with the Sheriff directly responsible.
That the Sheriff, Undersheriff in charge of the jail, Wardens and personnel be informed of their clearly defined responsibilities and be subjected to impeachment, dismissal, fines or imprisonment in accordance with what this Jury recommends as punishment for laxity, indifference, or any proved violation.
That vigorous men and women be employed in the County Jails and that, upon reaching retirement age, or becoming physically impaired, they be promptly retired.
*31 That responsibility for the operation of the institution should come under the Warden and that he be trained in the field in which he operates, in accordance with law and regulations.
In summing up the investigation, the Jury is aware, and the public should be made aware, that it is an amazing fact that no wholesale jailbreak was completed, with conditions as they were and laxity so apparent. A real desperado of the Dillinger or Karpis type would have had no difficulty in smuggling in a young arsenal and fighting his way out, possibly killing, or seriously injuring, jail personnel as well as any other person, or persons, who got in his way."
On October 23, 1951, the sheriff moved in the Superior Court to have what he termed the defamatory portions of the grand jury's presentment expunged from the files, these parts of the presentment being indicated in his motion papers in italics:
"Contrary to customary Grand Jury procedure, those viewed as defendants in light of the serious charges involving the Department for which they were responsible were also called to testify. These included the Sheriff, Undersheriff, Warden and jail personnel. These latter witnesses were not, on the whole, cooperative. They were reluctant to give straight-forward stories and were often evasive and defiant. Motivated by fear of losing official prestige, reputation, jobs, even reprisal, their testimony under oath ranged from evasive answers to, what we believe to be, false swearing. Upon such evidence, this Jury is unanimously convinced that laxity in the Camden County Jail reached deplorable proportions and, furthermore, that indifferent [indifference] to responsibility, from personnel to the top elective office helped directly in the existence of a `pay-or-else' system which was a public safety hazard, a destroyer of the morale of the majority of the prisoners, and a mockery of the restrictions which should be placed upon those who violate our laws. * * *
The Sheriff's disinterest and lack of knowledge of his job, based upon his own admitted testimony before this Grand Jury, rates the strongest kind of moral indictment. Moral only because the laws of the State fail to define clearly his chargeable responsibilities and fix legal penalties upon failure of such elected officials who fail to complete these properly.
While the Sheriff's testimony convinced the Jury of his general lack of knowledge of what was going on, the Martino-angle as far as the Sheriff was concerned is a clearcut example of the extent of his lack of interest. If he did not know that Martino was a constant visitor even casual attention to the job would have revealed this. This Jury remains convinced that the Sheriff was a poor witness whose testimony was evasive and lacking in cooperation which an investigating Grand Jury should expect from a public servant who *32 was properly discharging his duties. It is further the final opinion of the Grand Jury that until the commencement of this investigation at least, he had failed miserably in his public trust.
How much more money than that which could be placed by evidence exchanged hands or who pocketed it, this Jury cannot state, and it is not within its premise to speculate. Enough to say, that the system which thrived at the Camden County Jail, through laxity at the top, and in the middle, caused acceptance at the lower levels, and must have yielded a relatively sizeable return for those involved."
At the outset of the oral argument before the assignment judge the sheriff moved to suppress the portion of the State's brief that quoted parts of the grand jury minutes, and the court granted his motion. At the conclusion of the oral argument the assignment judge dismissed the motion to expunge the presentment, saying that he found "nothing therein that was not within the province of the grand jury to report." The sheriff appealed to the Appellate Division of the Superior Court, and we have certified the matter on our own motion.
On the appeal, with the permission of the assignment judge, the State printed as part of its appendix 12 pages of the testimony of the sheriff before the grand jury, presumably the same testimony that the trial court had declined to consider on the motion below. The appellant urges that we should not consider this testimony for the reason that it was not before the trial court. In the circumstances we agree with this and we accordingly have not used this testimony in deciding this appeal.
On the oral argument it developed that, although the grand jury spent months on the investigation into conditions at the county jail, it was not at any time specifically charged by the assignment judge, or any other judge at his direction, with reference to the matter. The assignment judge is in effect a successor in each county of the justice of the former Supreme Court assigned to the county. The former Supreme Court justices were in direct charge of all of the law courts in the counties assigned to them. Originally they tried all the cases in the Supreme Court on circuit and in the Court *33 of Oyer and Terminer. As judicial business increased the trial of cases in the Supreme Court at the circuit was referred to the circuit judges and the trial of cases in the Court of Oyer and Terminer was delegated to the common pleas judges, although it was not unusual well into the present century for a Supreme Court justice to try cases at the circuit and they continued regularly to hear murder cases in the Court of Oyer and Terminer for a much longer period until the growing pressure of appellate work forced them to relinquish this function too. But at no time, even though in the first quarter of the Twentieth Century appellate work was falling in arrears, did the justices of the former Supreme Court surrender their supervisory and administrative duties in the counties in their judicial districts.
These duties include the drawing of jury lists, the selection of grand juries, and the charging of the grand jury. Three times a year in each county the Supreme Court justice attended at the opening of the term when the grand jury was selected and charged it concerning its grave responsibilities in the presence of the bench and bar of the county. If matters developed during a term that required further consideration, he returned to give the grand jury additional instructions.
Without in anywise minimizing the importance of any phase of the work of the Supreme Court justice in the orderly administration of justice, it may be said that from time immemorial the charge of the justice presiding in the county on the occasion of the organization of the grand jury and his subsequent charges on such special matters as may come to his attention during the term of service of a grand jury have had a significance that cannot be overstated if criminal justice is to be done in a county and the public welfare is to be safeguarded. This was universally recognized not only by the bench and bar but by the public. Rule A-8 was designed to charge the assignment judge in each county with these weighty responsibilities:
*34 "He shall be responsible for the duties heretofore performed by the Supreme Court Justice in the county with respect to jury panels, charging the Grand Jury, the assignment of cases in the Superior Court and the County Court in the county, and generally for the orderly administration of civil and criminal justice in said courts, subject to the direction in administrative matters of the Chief Justice. He shall preside at such criminal trials as he shall deem necessary."
While the grand jury is an independent body in investigating the facts and in making presentments and indictments, it necessarily looks to the judge presiding in the county not only for instructions on the law to govern its deliberations in particular matters but also as to the matters of crime or of public concern that should receive its attention. Any unusual matter such as the conditions in the Camden County jail manifestly calls for specific instructions, if the criminal law is to be adequately enforced and if the public interest in the efficient administration of public institutions is to be maintained. We must constantly keep in mind not only that in the last analysis every civil right that we treasure necessarily depends on the orderly administration of the criminal law, but also that the sound administration of government at every level depends in large measure on enlightened and informed public opinion and that in this field the grand jury not only has rights but grave responsibilities.

II
The document in question, although called a "report" by the grand jury, is treated by the appellant as a presentment, and properly so. In some states grand jury "reports" are known and either sanctioned or condemned, but not in New Jersey. The grand jury within its sphere is an independent body and it reports to no one. Its function for centuries, at common law and here, has been to indict or to present and its work is limited to indictments and presentments.
While we are concerned here with a grand jury presentment, it is to be noted that the term "presentment" is not limited *35 at common law to the work of the grand jury: "There are other presentments of church wardens, constables, surveyors of the highways and justice of the peace," 4 Burn's Justices (17th ed., 1793) 57, 376-377; 2 Id. 542-551. The term "presentment" is also applied to a coroner's inquisition, Paterson's Laws 196-197 (1796), now R.S. 40:40-17, and it is commonly used here by the ethics and grievance committees appointed by the court for each county to describe their findings handed up to it in disciplinary matters, see Rules 1:9-4 and 1:9-5. Thus presentments relate not merely to the work of the grand jury and to criminal accusations, but to a much wider variety of matters.
In the criminal law the term presentment has been used in two senses: it included "not only presentments properly so called, but also inquisitions of office and indictments by a grand jury. A presentment, properly speaking, is the notice taken by a grand jury of any offense from their own knowledge or observation without any bill of indictment laid before them at the suit of the king," 4 Blackstone's Commentaries 301; Burn's Abridgement 328. Presentments in this criminal sense have long since disappeared everywhere in practice for reasons which we hereafter develop. But although criminal presentments have vanished, the term, "presentment by a grand jury," has also been employed for centuries to designate the findings of a grand jury with respect to derelictions in matters of public concern, particularly of officials, which may fall short of being criminal offenses. This type of presentment differs from the obsolete criminal presentment in that it does not lead to a trial, but merely to a notice to the offender.
To comprehend the significance of presentments today with respect to public affairs and to understand the work of the grand jury it is necessary to sketch the various modes of criminal prosecution known to the common law and available in this State, and their relation to the work of the grand jury. The earliest, mentioned here only for sake of completeness, was the appeal of felony, an accusation by one *36 individual against another for some heinous crime, 4 Blackstone's Commentaries 312. The appeal, which dated back to the Norman Conquest, was gradually superseded by presentments, indictments and informations on the criminal side and by trespass civilly, 2 Holdsworth, History of English Law 360, 3 Id. 608-609, although an appeal of murder was heard in England as late as 1818, Ashford v. Thornton, 1 B. & Ald. 405, and led to the abolition the next year of both trial by battle and the appeal of murder, 2 Holdsworth 364; see also Ames, Lectures on Legal History 47-55. Although available here in colonial times as a criminal remedy, no record of its use has been located, but it was used occasionally in other states, see Soaper v. Negro Tom, 1 Har. & McH. 227 (Md. 1765).
The inquisition or presentment of a coroner's jury in the case of an unexplained death was another ancient mode of criminal accusation, Bracton 121; 1 Holdsworth 82, 85; 3 Id. 611. It was adopted here as part of the common law and examples of its use in colonial times are to be found in Edsall, The Journal of the Courts of Common Right and Chancery of East New Jersey, 1683-1702, 221 (1937) and Reed and Miller, The Burlington Court Book of West New Jersey, 1680-1709, 71, 95, 166, 206, 213. The law on the subject was codified in 1795, Paterson's Laws 195-197, but the utility of the presentment of a coroner's jury was nullified by the strange decision in State v. Powell, 7 N.J.L. 244 (Sup. Ct. 1824), where the court had before it an inquisition of a coroner's jury for murder and a grand jury's indictment for manslaughter. Notwithstanding the fact that the statute then provided that such inquisitions shall be proceeded with by the court, Paterson's Laws 197 (and still so provides, R.S. 40:40-17), the prosecutor applied to the court for directions whether to proceed on the inquisition or the indictment, suggesting to the court that the Fifth Amendment to the Federal Constitution barred a proceeding to answer for a capital crime unless on a presentment or indictment of a grand jury. Although it is hornbook law that the Bill of *37 Rights in the Federal Constitution applies only to the Federal Government and not to the state governments, Chief Justice Kirkpatrick stated: "There is no question at all that in this state we can proceed only upon the presentment of the grand jury." Apparently the coroner's jury was esteemed very lightly, for thereafter there appears to be no record of a proceeding on the inquisition of a coroner's jury, nor could there be after the adoption of the Constitution of 1844 providing that "No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury." (Art. I, par. 9.)
A third ancient method of criminal prosecution, nearly as old as the indictment, was the criminal information which was an accusation of crime handed up to the court by the Attorney-General or other appropriate law officer without any indictment or presentment of a grand jury, 4 Holdsworth 524; 6 Id. 406, 628; 9 Id. 236-245. The criminal information had a checkered career in England, particularly by reason of its use by the Stuarts for the prosecution of political misdemeanors, Sir John Eliot's case, 3 S.T. 294 (1630), and the Case of the Seven Bishops, 12 S.T. 183 (1688), being conspicuous examples. Nevertheless, it was received here as part of the common law and frequently used, Edsall, op. cit., 129, 181, 183-185, 186, 230, 238 and Reed and Miller, op. cit., 83, 199. Some relief against the oppressive use of the criminal information was afforded by an act of March 11, 1713-14, Allinson's Laws 23-24, barring criminal proceedings on information except on order of the Governor signed in council. It was not until 1795, however, that all criminal informations were forbidden "in which no civil right is involved nor forfeiture or penalty given by law to any private person or common informer," Paterson's Laws 172. The prohibition against criminal informations was not incorporated in the organic law of New Jersey until the adoption of the Constitution of 1844, Art. I, par. 9, providing:
"No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury, except in cases of *38 impeachment, or in cases cognizable by justices of the peace, or arising in the army or navy or in the militia, when in actual service in time of war or public danger."
This paragraph of the Constitution occasioned no debate in the 1844 Constitutional Convention; see Proceedings of the New Jersey State Constitutional Convention of 1844, 52, 412, 590, and the reason is clear. New Jersey was one of the few states that had no bill of rights in its first Constitution, the Constitution of 1776 having been drafted in a few days under great stress and adopted on July 2, 1776, on the eve of the Revolution. One of the avowed objectives of the Constitutional Convention of 1844 was to remedy this defect of the earlier Constitution, the paragraph in question being derived from the Fifth Amendment to the Federal Constitution, which in turn was taken from a considerable number of similar provisions in state constitutions. It was designed primarily to outlaw criminal informations at the hands of the executive branch of government, thus strengthening the application of the doctrine of the separation of powers in an important area and, incidentally, it also formally eliminated the outmoded criminal appeal and the presentment of the coroner's jury. Clearly the amendment was not designed to revive the outmoded criminal presentment as a substitute for an indictment. A criminal presentment is needed only when the grand jury does not have a legal adviser available to prepare indictments for it. The need for and use of criminal presentments disappeared with the appointment of Deputy Attorneys-General to present the pleas in each county, L. 1812, p. 23, and the appointment of county prosecutors, L. 1822, p. 25; Harrison's Laws 49 (1833). All of this was a matter of common knowledge to the distinguished members of the Constitutional Convention of 1844. A criminal presentment under the 1844 Constitution was a legal possibility, but not a reality. The members of the Constitutional Convention were also quite familiar with the noncriminal use of the presentment by a grand jury on public affairs and manifestly did not disapprove of its use.
*39 Thus in 1844 for the first time the terms "presentment," "indictment" and "grand jury" appear in the New Jersey Constitution, though they had been retained in our law through Articles XXI and XXII of the Constitution of 1776, Article XXI taking over the statutes contained in Allinson's Laws not incompatible with the new Constitution, and Article XXII continuing in force the common law theretofore practiced in New Jersey, excepting only parts repugnant to the Constitution of 1776. These terms  "grand jury," "presentment" and "indictment"  were accepted and have been perpetuated with their common-law meanings and traditions. Thus in 1682 in East Jersey:
"Grand juries were directed to appear at the County Courts; but what made them eligible, of whom they should be composed, by whom they should be summoned, and what were to be their duties, was not stated. This all seems inexplicable, and it appears most difficult to understand the apparent inconsistency, or to solve the mystery. These laws can only be explained or interpreted in one way. The early settlers in East Jersey were mostly Englishmen, and as such were thoroughly acquainted with the principles of the common law as it existed in the mother country, where courts of similar name and like character were to be found. These courts in England were governed by the rules of that universal law so dear to every Englishman's heart. The English colonists had drunk deep and long draughts from the fountain of liberty, which had been opened in the time of Charles II, when Selden and Eliot, Pym and Hampden had taught a wicked and sensual king that his subjects had rights which he must respect, and when Sir Matthew Hale was Chief Justice and Lord Nottingham was Lord Chancellor. These colonists had fled from their old home beyond the sea to escape religious persecution; but they brought to their new home those unquenched and unquenchable aspirations for civil as well as religious liberty which impelled them ever to provide for absolute freedom from oppression and for the preservation of their political rights. They were stern and unyielding in their religious views, and they were equally unyielding when their political freedom was endangered, and watchful in guarding against any action by Governor, or State, or Legislature which seemed at all like interference with their rights as citizens. This feeling pervaded all classes and led them to seek to discover what were the best foundations to civil liberty; so, they studied the principles of the common law of England and needed no statute to enable them to understand how to conduct the courts provided for them. They needed only courts properly constituted; and falling back on their knowledge of the modes of procedure in similar courts in the mother country, they required nothing more.
*40 There was a remarkable fact connected with the legislation respecting these early courts. In the law constituting them there was no provision for their guidance; no rules by which they were to be governed; no mode established by which their judgments were to be enforced; there was no Practice Act, nor anything like it. The statutes constituting them were the simplest possible; the tribunals were created, their titles given, and the times and places when and where they were to meet; and that was all." 1 Whitehead, Judicial and Civil History of New Jersey 372-373 (1897).
Indictments have likewise been employed in their common-law meaning from the establishment of the earliest courts in New Jersey. There has been only one important change over the years. With the appointment of Deputy Attorneys-General to prosecute the pleas in the several counties, L. 1812, p. 23, and the appointment of county prosecutors of the pleas, L. 1822, p. 25; Harrison's Laws 49 (1833), the practice of the aggrieved party preparing his bill of indictment in advance of the hearing of testimony by the grand jury disappeared and the formal bill was prepared by the prosecutor on instructions from the grand jury after it had heard the evidence. This is now the general practice wherever grand juries are used.
The term "presentment" as related to a grand jury was likewise used here from the earliest times in precisely the same manner as at common law as hereinbefore described. The presentment of a grand jury in its generic sense still embraces indictments. Thus the oath of a grand juror, at common law as well as here now, says not a single word about indictments; on the contrary, at common law the grand jury swore to "diligently inquire and true presentments make," Shaftsbury's Trial, 8 How. St. Tr. 759 (1681); now he pledges himself in almost identical language to "diligently inquire and true presentment make," N.J.S. 2A:73-3. Similarly the presentment of a grand jury in the narrower sense has always meant here, as at common law, not only a crime considered by a grand jury on its own motion and of its own knowledge, but also a grand jury's findings with respect to public affairs and especially the *41 derelictions of public officers, which may or may not fall short of being criminal offenses. Presentments specifically charging crime were commonly used instead of indictments when a prosecutor or other law officer was not regularly assigned to attend the grand jury, but they disappeared naturally enough with the coming of Deputy Attorneys-General and prosecutors of the pleas in each county; L. 1812, p. 23, L. 1822, p. 25, Harrison's Laws 49 (1833). Presentments dealing with public affairs were equally well known at common law and in the colonies, Dession, "Grand Juries," 41 Yale L.J. 687, 706 (1932).
Because this power of grand juries in this State to make such presentments as to public affairs has been questioned, it is essential to inquire into the existence of the power it has exercised here from the earliest colonial days. To show the colonial practice we will quote first from Reed and Miller, Burlington Court Book of West New Jersey, 1680-1709, supra, examples of both kinds of presentments:
"The Grand jury present the County for Want of a Prison, upon the Complaynt of the Sheriff." (p. 72.)
"They present the County for Want of a Prison in Burlington for a County Prison. Alsoe they present Burlington for not keeping London Bridge in repayre. Alsoe they present the Kings Highway Leading from Burlington towards Shrewsbury being out of repayre. Alsoe wee present Walter Reeves for marking his Swyne with another mans marke which is recorded before." (p. 80.)
"Alsoe presented the person or persons concerned for not finishing the Court house.
Alsoe presented yorkshire Bridge and the Bridge at Godfrey Hancocks for not being repayred." (p. 83.)
"They present John Crosby for laying a pair Milstones at the Townes Landing at Burlington to the annoyance of the Province. Presented alsoe Lawrence Morris for setting a Haystack at the end of John Hollinsheads house in Burlington to the danger of the Towne. Presented alsoe the Inhabitants of the Towne of Nottingham for not making a sufficient Bridge over the River Darwin.
Presented alsoe the Inhabitants near Daniell Bacons for not makeing two bridges betweene said Daniels and Thomas rights over the *42 runs lyeing in East Jersey Road; Presented alsoe the Inhabitants of the Towne of Burlington for not ringing their Swyne above three Moneths old." (p. 91.)
"Presentments per Grand Jury vizt, That a substantiall and good prison be built and finished in Burlington by this County before the Twenty Nyneth of September next upon penalty of Sixty pounds for default thereof. Alsoe, That a substantiall County Pinfold be built in Burlington betwixt this and the first of the first Moneth next under the Penalty of five pounds for default therein.
Alsoe, the Highway to East Jersey presented and ordered to be sufficiently repaired and that Bridges be made over the Creekes before 25th December next.
Alsoe, The Highway betweene Daniell Bacons house and Cross-wicks Creek Presented.
Alsoe, The bridges over the Mill Creek and Pimsawking Creeke presented." (p. 92.)
"Wee present the Bridge upon the Mill Creek within the Liberty of the Towne of Wellingborrough upon the Kings Road and alsoe some bad Places betweene that and Burlington.
Wee present the Bridge by John Longs house upon Oneanickon Road to be repaired by the Towne of Burlington before the 20th day of this 3rd Moneth 1689 upon the penalty of 40s.
The Grand jury nominate the first of the third Moneth for the County of Burlington to meet to the Repayring of the Highwayes and alsoe the 10th of the 8th Moneth if need require yearly." (p. 99.)
"Alsoe Grand Jury presented the necessity of a County Gaol and for stock [?] propose something of a Method for laying a Tax upon the County for that purpose and referre their proposall to the regulation of the Bench; and the[y] Present Thomas Russell upon the suspition of Fellony." (p. 102.)
"The Grand Jury have noe particular Bills from the Court But of their owne knowledge present John Wood of the County of Bucks in Pennsilvania according to the Contents in their presentment upon fyle. They alsoe present William Emley Thomas Wright and Joshua Wright for purchasing Lands of the Indians Contrary to the Lawe of the Province." (p. 115.)
"Grand Jury Present the County for want of a Prison and for want of keeping the County Court house in repaire.
John Wood presented last court indicted this Court but neither hee nor any to prosecute appeare soe suspended-suspended.
William Emley Thomas Wright and Joshua Wright Presented last Court and Indicted this Court, the persons Indicted appeare, but none prosecutes Grand Jury have noe Evidence and finde not the Bill; thereupon at the request of the Persons Indicted They are quitt by proclamation." (p. 117.)
*43 "The Grand Jury present Henry Beck and Alice Rawood the daughter in Lawe of William Black for Committing Fornication. Henry Beck appeared on the behalfe of himselfe and said Alice (shee being not able to come) And acknowledged the aforeside Cryme; And on the behalf of himselfe and said Alice submitted to the Judgment of the Bench.
The Court haveing thereupon Considered of the aforesaid Cryme, order as followes (vizt) That the said Henry Beck give security for the Indemnifying the Court of Burlington, And for mainteyance of the Bastard Child; and that the said Alice Rawood after shee shall be delivered and well, shall be whipt, or pay 5 pounds.
Alsoe they present Thomas Peaches and Mary (his now wife) for Committing Fornication before marriage To appeare next Court.
Alsoe they present William Emley and Mary (his now wife) for Committing Fornication before Marriage To appeare next Court.
Alsoe they present John Hollinshead for damming up the Highway between Ponsaukin and Burlington." (p. 123, 124.)
There are 59 more such entries in the Burlington Court Book; see index under "presentments," p. 365.
The practice on presentments in East New Jersey was similar. Examples are to be found in Edsall, Journal of the Courts of Common Right and Chancery of East New Jersey, 1683-1702, supra:
"The Grand Jury brought here a presentment against one John Dennis of Woodbridge for makeing a mill Dame and stopping the water to the great Nusance of his Majesties subjects &c. Agreed that John Dennis have notice sent him to Attend this Court tomorrow morneing by Eight of the Clocke &c.  to answer the Premisses " (p. 221.)
"Wee do present the neglect of Regulateing weights & measures in this province according to the Act of Assembly.
Alsoe wee do present Ruth Rawlings now Inhabiteing in the town of Woodbridge for haveing a bastard Child Ordered by the Court that the said Ruth Rawlings be bound over & prosecuted at the next Court of Sessions held for the County of Midlsex." (p. 250.)
"The Grand Jury being Called gave in three presentments to witt Wm. Sandford John Hayman & Wm. Stage for Committing a breach of the peace upon the plantation of Mr. Isaac Kingsland &c. and the Town of Piscataway for want of a sufficient pond [pound] & for not mending their high wayes & bridges & John Langstaff of Piscataway for fenceing in a high way&. Ordered by the Court that the Clerk do draw up the presentment into forme and do issue out process against the persons Concerned to answer at the next Court in October next." (p. 276.)
*44 "We jurors upon our Oaths do present the County of Middlesex for not haveing a sufficient goal to secure fellons and other offenders." (p. 322.)
Although, as we have seen, the criminal presentment disappeared in practice 20 or 30 years before the Constitutional Convention of 1844, the presentment of public affairs continued under the 1844 Constitution. Although cases involving such presentments rarely appeared in the reports, an examination of the presentments handed up in Mercer County when Chief Justice Beasley presided there from 1864 to 1897, and in Essex County when Chief Justice Gummere presided in that county from 1901 to 1933, demonstrates that under the Constitution of 1844 there was no change in the earlier practice. Presentments in the sense of informal indictments had disappeared, but presentments concerning public affairs were frequent. Thus in Mercer County in the period referred to the grand jury made presentments which, for convenience, are here summarized:
(1) At the May term, 1866, the grand jury presented the results of its investigation of charges of bribery and corruption preferred against members of the Legislature, its officers and others. It stated that bribery practiced in the Legislature at its last session had been so extensive as to demand the most rigid investigation; that the most corrupt practices were freely indulged in to an extent truly alarming; that money and other insolences were used to corrupt members; that combinations were formed to influence the opinion, behavior and votes of members on bills and other proceedings pending before the Legislature; that these influences extended to some of the officers of the Legislature, who, although in receipt of large salaries, received from private individuals and members fees to prepare and present business to the Legislature and for other services. It was further stated that where possible indictments had been found, but that they represented but a small part of the stupendous wrong. It was pointed out that difficulties were experienced in obtaining evidence of the bribery and corruption and recommendations were made for an amendment of the statutes on the subject. The grand jury also presented as a kindred crime the corrupt use of money in elections, stating that with increasing boldness the freedom and purity of the ballot box was being invaded and the laws on the subject disregarded. At the conclusion of the presentment it was stated: "The Grand Jury therefore make this presentment in the hope that the attention of the court and the people may be called to the subject, *45 and that all good citizens will unite in discouraging the use of money at our elections and among members of the Legislature, and that they will promptly aid in presenting and punishing those who may be guilty of violating the law."
(2) At the January term, 1874, the grand jury in a presentment called the attention of the Pennsylvania Railroad Company to the fact that at the last term of court it had been presented by the grand jury for allowing a grade crossing to remain without a flagman, but that it had paid no attention to the previous presentment. Accordingly the railroad was censured for allowing this dangerous condition to remain and the grand jury expressed its determination to use all means in their power to secure an indictment against the railroad unless the grade crossing should have been rendered more safe.
(3) At the January term, 1892, the grand jury presented the results of its investigation into the escape of one William Seruby from the county jail. The opinion was expressed in the presentment that the ends of justice did not require that any keeper or employee of the jail be indicted for the escape of the prisoner, but that there were certain facts which should be known. The presentment then proceeded to describe the improper security measures used at the jail, made recommendations for their improvement and reported that the escape was the result of the negligence of a messenger, the neglect and disregard of duty of a night watchman, and of other deficiencies and neglects for which the deputy warden and the warden were responsible.
(4) At the October term, 1892, the grand jury in a presentment pointed out that it had been obliged to hear a very large number of cases of assault and battery committed by a husband on a wife. It found that many injured wives were unwilling to have due and proper punishment meted out to their delinquent husbands for the fear that fine or imprisonment would leave them without support. Accordingly, after expressing the opinion that wife beating was on the increase and that there was no meaner or more contemptible crime, the grand jury recommended that the whipping post be established in this State as a punishment for wife beaters and that punishment by public whipping be inflicted in all cases where it is practical.
(5) At the May term, 1894, the grand jury returned two presentments. In the first presentment it stated that pursuant to the charge of the court it had carefully examined the management of the New Jersey State Prison and as a result of its investigation had found that prisoners could readily possess tools and implements with which to effect an escape, that the system of searching prisoners in cells was unsatisfactory, that the force of keepers employed at the prison was inadequate to insure full observance of all prison rules and regulations, that the practice of locking a keeper in a wing for a *46 whole night without contact with others in the prison was improper, that a system of telephonic contrivances should be installed in the prison to report automatically to the central keeper the location of any noise or disturbance, and that better discipline should be enforced at the prison. In the second presentment the grand jury presented the Trenton Passenger Railway Company for maintenance of dangerous conditions by the failure to pave between its tracks and rails and for a failure to cover power lines. While censuring the railway company for its disregard of its obligations to the public in these respects the grand jury stated that it did not consider it imperative to indict the company for the reason that civil remedies were available to bring about a correction of the situation, but the grand jury stated that, if matters were not promptly and completely taken care of, the civil authorities should again invoke the machinery of the criminal law to accomplish the abatement of these dangerous conditions.
(7) At the May term, 1895, the grand jury in its presentment stated that under the charge of the court it had investigated many matters in relation to the management of the state business, the construction of the state buildings, the furnishing to the State of supplies of various kinds, and the conduct of the different officers employed by the State in their various capacities, and that in certain cases where it was merited it had returned indictments, but that it was precluded from making indictments in certain cases because of the inability to apply the criminal law beyond the period of two years against a private citizen or five years against a public officer acting within the scope of his official employment. Accordingly, the grand jury proceeded to present the fact that an officer of the State had collected large amounts of money for the use of the State and deposited the same in his own personal account; that while it appeared in this particular case that the money had been repaid to the State, the practice should be discouraged and all state money kept in a sacred fund in trust by itself; and that their attention had been directed to many instances of loose methods of conducting the State's business which were conducive to crime and made detection difficult, such as supposedly reputable persons swearing to the correctness of bills submitted to the State without making the slightest investigation as to their accuracy and when even a cursory examination would have demonstrated that they were false. The grand jury expressed the opinion that new legislation should be attempted for the purpose of correcting these methods, with one suggestion being that it be made perjury to swear to a bill presented to the State without accurate and personal knowledge of its correctness.
In Essex County the presentments submitted to Chief Justice Gummere were more numerous than those submitted in Mercer County to Chief Justice Beasley. They, too, are here summarized for convenience:
*47 (1) At the April term, 1901, a presentment was made finding that the isolation hospital was completely inadequate both from the standpoint of location and of equipment and the building of a new hospital was an immediate necessity; that, while there was no evidence to support an indictment of the school board of Belleville, the management of school affairs in the township was a disgrace to the community and that, although the grand jury did not have power to deal with the problem, if it did it would remove all who were entrusted with the administration of school affairs in the township; that the managers of the bicycle track in Vailsburg were not indicted for the nuisances created on Sunday by the holding of races, but that they and the public authorities must take steps to protect the inhabitants of the area from undue noise and disturbance or else public prosecutions would have to follow.
(2) At the September term, 1901, in its presentment the grand jury made note of the mass of trivial complaints sent to it by the police court through the justices of the peace and recommended that some other method be adopted to dispose of such cases; as a result of a fourth of July death it recommended that firearms be prohibited as a means of celebration and that the city by appropriate ordinance rigidly control their use; it discussed complaints with respect to the violation of the Sunday liquor laws and found that reasonable, not literal and rigid, enforcement thereof was all that the people wanted and it recommended that the existing laws be amended to provide for a local option in each municipality; it called attention to the state of disrepair and the unsanitary conditions existing at the fourth precinct police station house; it dealt with a current outbreak of smallpox in the city and pointed out the need for an adequate isolation hospital; and it recommended the placing of a police officer at each of the four corners of the intersection of Broad and Market Streets during the busy hours of the day.
(3) At the December term, 1901, the grand jury made a presentment calling attention again to the deplorable conditions existing at the fourth precinct police station, and in connection with an indictment returned against an official of the Water Department in the City of East Orange, it reported that the supervision of the department was of such a character as to invite fraud by dishonest officials and found that the water committee and the board of aldermen had not shown proper care in performance of their duties.
(4) In an undated presentment (apparently returned some time in 1901) the grand jury charged the rich with fraudulently evading personal property taxes, and while it found that in accordance with the court's charge indictments would not lie, it was recommended that the laws be changed so as to make such conduct criminal.
(5) At the April term, 1902, the grand jury reported favorably on most of the public institutions inspected by it, but reiterated *48 statements by predecessor grand juries to the effect that the fourth precinct police station house was inadequate and in poor repair. Considering that it would be a waste of public funds to attempt to repair the building, it recommended that the site be sold and the proceeds of the sale applied to the erection of a new building. It also recommended that greater precautions be taken to protect the public against accidents due to the reckless speeding of automobiles, and called the attention of the proper authorities to the unsanitary condition of the Morris Canal.
(6) At the September term, 1902, in its presentment the grand jury stated that the county hospital at Overbrook was in need of a social hall for nurses and inmates and that greater fire precautions needed to be taken; recommended the purchase of additional fire extinguishers for all city and county institutions; suggested that the almshouse be removed from the city proper to one of the more open areas of the county; and expressed the opinion that the Essex County jail was a reproach to the community, being unsanitary, insecure and unfit for the keeping of prisoners, and pointed out that a new jail was needed. It further advised that youthful prisoners be kept separate from adult inmates, and recommended the passage of a law which would check the justices of the peace in bringing trivial cases before the grand jury.
(7) At the September term, 1903, the grand jury in its presentment recommended that the Board of Excise Commissioners of Newark exercise tighter control in the granting of saloon licenses; pointed out the need for abolishing dangerous railroad grade crossings; directed the attention of proper authorities to the nuisance created by the failure of bridge tenders to promptly raise their spans and permit boats to pass; condemned the West Orange police station as being inadequate and unhealthy and recommended that steps be taken without delay to secure more healthful quarters; suggested that barriers be installed on the windows of the city hospital to prevent patients from jumping out; urged better enforcement of the city's fire arms and fire works ordinances; pointed out the result of its investigation of fire insurance frauds perpetrated in the city, and found that the insurance companies were guilty of willful negligence in not preventing the frauds. The grand jury also presented Max Muller, a justice of the peace, for gross violation of his official duties deserving of severe punishment, stating that if indictment had been permitted it would have without hesitation returned many indictments against him and that he was guilty of malfeasance in office so vile and scandalous as to make it a disgrace to the county. It was recommended that he be impeached and deprived of his office.
(8) At the April term, 1904, the grand jury presentment recommended that the city almshouse be removed to a rural section of the county; called attention to certain defects and deficiencies in the *49 buildings of the city hospital requiring immediate attention; criticized the rules of the board of health governing the admissions of patients and the use of ambulance service; recommended that suitable quarters for the detention of witnesses be provided at the county jail; recommended the abolition of the lock step and the stripe suit at the county penitentiary; recommended the installation of awnings at the Essex County Hospital for the Insane; criticized the food at the hospital at Overbrook; censured the board of street and water commissioners for failure to abate a nuisance caused by inadequate sewer facilities; called attention of the proper authorities to a nuisance created by a slaughter house in Vailsburg; and recommended that the Legislature revise and amend the statutes governing criminal proceedings within the province of the justices of the peace so as to eliminate reference to the grand jury of many petty and trivial cases.
(9) At the September term, 1904, the grand jury in a presentment pointed out the need for adequate quarters for the medical staff at the Overbrook branch of the county hospital; the need for a more adequate fire prevention system there; the need for a recreation hall at the city home; pointed out that the Essex County Hospital for the Insane was overcrowded and in an undesirable location and lacked necessary equipment to protect inmates in case of fire; recommended that the laws against carrying concealed weapons be made more strict; criticized trolley car motormen and trolley company officials for failure to obey safety requirements and in case of trolley accidents recommended that the police officers take the names of all persons who were witnesses. The grand jury also called the attention of appropriate public officials to the necessity for more adequate inspection of fire escapes on public buildings and tenement houses; criticized the ambulance service of the City of Newark as inadequate and inefficient, and recommended that each of the private hospitals in the city be provided at public expense with an ambulance subject to public or private call day and night.
(10) At the December term, 1904, the grand jury in its presentment recommended the removal of the city's almshouse from its present site to a rural section of the county; found the county hospital for the insane on South Orange Avenue overcrowded and recommended that it be abandoned; criticized the construction of the insane hospital at Overbrook and recommended certain changes that should be made there; and suggested that the management of the county hospital for the insane be reorganized to provide for an executive head and a head of the medical department.
(11) At the December term, 1905, the grand jury handed up a presentment reporting the results of its investigation of charges of fraud in connection with a primary election, pointing out that the election had been conducted in a most careless manner; that election *50 officers lacked necessary qualifications for their office; that there had been a general use of money at the primary and general elections, although the evidence was not sufficient to warrant any indictments for bribery; found that there had been much false registration and recommended the enactment of a personal registration act such as had been recently adopted in Pennsylvania; recommended a change in the laws with respect to the ordering of a recount; criticized the manner in which previous grand juries had conducted their inspections of public institutions. It recommended certain changes at the county penitentiary, the protection of a railroad grade crossing at Overbrook, the abandonment of the almshouse because of the inadequacy of its buildings, and labeled conditions at the Essex County jail as deplorable. Finally, it recommended a shorter period of time for the service of a grand jury.
(12) At the April term, 1905, the grand jury handed up a presentment recommending the installation of more adequate fire fighting facilities at the various county institutions; criticized the accommodations at the county jail for the detention of witnesses and recommended the erection of a separate building for them; recommended the tearing down of the east wing of the jail and the building of a modern structure in its place; considered deplorable the continuation of the city almshouse; criticized the lack of segregation of minor offenders and hardened criminals at the county penitentiary; recommended the division of the responsibility for the management of the county hospital for the insane; called attention to certain unsatisfactory conditions existing at Overbrook; and recommended the installation of a non-political system for the hiring of employees in the Newark City Street Department, whose work it severely criticized.
(13) At the September term, 1905, the grand jury presented a recommendation that a new almshouse be erected in place of the present one; recommended the installation of better fire protection apparatus at the city home and the opening there of buildings for the confinement of wayward girls; recommended that better accommodations be provided for the witnesses at the Essex County jail and that certain fire hazards there be eliminated; criticized the city hospital as being uncleaned and in need of paint and repair; and called attention of proper authorities to the necessity of enforcing ordinances regulating the storage and possession of inflammable liquids.
(14) At the September term, 1906, the grand jury found a presentment criticizing the management of the county penitentiary at Caldwell and recommending the change in certain practices there; criticized the lack of segregation of male and female witnesses at the county jail and found the board of chosen freeholders censurable for permitting such conditions to exist and continue; recommended *51 the removal of the city's almshouse; criticized the Newark city police force for making promotions on considerations other than merit; recommended that the police department more strictly control dance halls in the City of Newark; called attention to the laxness of city officials in detecting and punishing infractions of the Disorderly Persons Act; criticized the construction and maintenance of trolley cars in the city and recommended the enactment of further ordinances with respect thereto; and called the attention of proper officials to the laws requiring the removal of ice and snow from sidewalks and gutters.
(15) At the December term, 1906, the grand jury in its presentment criticized the lack of segregation of males and females in the Newark police stations; recommended a more careful grading and classification of inmates at the county penitentiary and the enlargement there of employment opportunities for inmates; made recommendations for the institution of new procedures which would relieve the grand jury of much of its trivial work by a broadening of the police courts and other means; recommended that special treatment be given to alcoholic prisoners; criticized the Board of Street and Water Commissioners of Newark for not enforcing the ordinances for which they were responsible; recommended that appropriate city officials take steps to enforce the anti-smoke ordinances and abate the nuisance being created by certain power plants and factories in the city; recommended the establishment of a purchasing department for cities and the county; recommended changes in the election registration laws and the passage of legislation to control combinations in restraint of trade.
(16) At the April term, 1907, the grand jury returned a presentment criticizing the lack of sufficient ambulance and hospital service; the need for an appropriate place to detain juvenile offenders; improper construction of the insane asylum at Overbrook; the existence of dangerous grade crossings on the D.L. & W. Railroad; and the impropriety of the board of aldermen spending public moneys for personal pleasures.
(17) At the September term, 1907, the grand jury filed a presentment stating that certain theatres were centers of moral infection among the juvenile population of the county and generally condemning motion pictures.
(18) At the December term, 1907, the grand jury in its presentment recommended that the county have a home corresponding to the city home at Verona; criticized the Newark police protection as inadequate and recommended the establishment of additional precincts; condemned the lack of adequate traffic control resulting in congestion in the city; pointed out certain deficiencies at the county jail, principally with respect to sanitation, overcrowding and lack of segregation *52 and recommended stricter precautions to prevent prisoners receiving drugs; recommended improvement in the kitchen and quarters for attendants at the county penitentiary; recommended that the board of freeholders study the entire penal system and its objectives; criticized the board of freeholders for establishing a handkerchief industry at the penitentiary in competition with private industry; deplored the condition of the morgue at the city hospital; and found inadequate the ambulance service available to the City of Newark.
(19) At the April term, 1908, the grand jury handed up three presentments. The first called attention to certain abuses in the selling of liquor at private meetings and the like, but expressed confidence that the chief of police would suppress the abuses. The second presentment pointed out the overcrowding that resulted from the failure to complete the county isolation hospital as planned and recommended that it be completed as rapidly as possible; and suggested certain changes at the county penitentiary and the county jail; recommended that fire protection measures be taken at the almshouse; that investigation be made of classification of persons at the county hospital for the insane; that fire escapes and verandas be supplied at the tuberculosis hospital; that an administration building be erected at the city home in Verona; and that the ordinances with respect to weights and measures be more rigorously enforced to prevent fraud. It pointed out that certain property owned by the city was in a dilapidated condition and that the buildings thereon should be removed and the property fenced; recommended that a house of detention be established separate from the county jail to provide for the holding of witnesses; that an emergency hospital be established; that evidence given in court respecting the violation of the excise laws be given to the board of excise commissioners for their use in the granting and renewal of licenses; and that a system of public advertising for open bids be established for all county institutions and that specifications be drawn to insure uniformity in the quality of supplies being furnished. The third presentment recommended that the Board of Public Works of the City of Newark pass an ordinance requiring street railways companies to separate double tracks at dangerous points sufficiently to decrease the danger to pedestrians crossing the tracks.
(20) At the September term, 1908, two presentments were returned. The first presentment criticized conditions at and made recommendations with respect to the county penitentiary; recommended the erection of a dwelling for the resident physician at the city hospital for consumptives and the change in certain practices there; recommended that boys now sent to the city home at Verona be sent to the state institution at Jamesburg; that a hospital for incurables be established outside of Newark so as to relieve the congestion at the city hospital; that the city almshouse be removed *53 from its present location as soon as possible; that consideration be given to the erection in the future of a building to replace the city dispensary; criticized the delay of the board of public works in erecting public comfort stations; called the attention of public authorities to defective lighting and protection at a trolley crossing; called the attention of the authorities to a defective sidewalk on Central Avenue; complained against the practice of justices of the peace referring matters to the grand jury and stated that many of the justices had but one objective, to exact a fee for drawing a complaint, and accordingly it was recommended that the fees be abolished. The grand jury also called attention of the Essex County Park Commission to a dangerous road at the entrance to Branch Brook Park and the attention of the authorities to a dangerous bridge over the Morris Canal. The second presentment criticized conditions at the almshouse; pointed out the need for a house of detention separate from the county jail; recommended the replacement of the iron bars in the windows of the county hospital for the insane at Overbrook with iron window sashes; recommended the making of certain changes in practices and plans at the Essex County Penitentiary; recommended the abolition of a grade crossing near the city home and Overbrook Hospital; recommended that the salary of the clerk of the grand jury be increased; and recommended that new quarters be provided for the city dispensary.
(21) At the December term, 1908, two presentments were returned. The first called attention to an outrage committed under the guise of official authority by the sheriff's office at the last general election, and the unwarranted expenditures of money by the county in carrying out these outrages. Reciting the facts at length, the presentment severely condemned not only the sheriff's office and the undersheriff, Charles M. Mason, but also Henry Bosset, a justice of the peace who had furthered the corrupt scheme. Attention was also directed to inadequately lighted thoroughfares in the county and to the long working hours at the handkerchief factory in the county penitentiary. The second presentment called attention to the fact that female nurses at insane asylums were overworked and underpaid; it criticized the lack of adequate fire escape facilities at the tuberculosis hospital at Verona, the public schools in Newark and the Newark City Hospital and recommended the appointment of a commission to study the question and to propose remedial measures.
(22) At the April term, 1909, three presentments were returned. The first criticized the fire fighting equipment at Overbrook Branch Hospital; the lack of accommodations for guards at the county penitentiary; the need for an ambulance at the Essex County Isolation Hospital; the absence of fire escapes at the city hospital in Newark; the unsatisfactory conditions at the almshouse; the necessity for shortening the hours of nurses and attendants at the hospitals for the insane; and the hardships resulting from the failure of the county *54 to pay many of its employees for as much as six months or more. The second presentment took notice of the prevalence of criminal assaults upon employees of manufacturers in Orange and recommended that the excise commissioners of Orange investigate two saloons with a view toward revoking their licenses; found that the police force of Orange is inadequate and recommended that persons found attacking employees of the manufacturers in the area be held for the grand jury so that they may be severely punished. The third presentment recommended the abandonment of the almshouse as unfit for its purpose; pointed out that the ambulance service in certain sections of the city was inadequate; recommended that a lever system for locking prisoners in their cells at the penitentiary be installed; found the morgue at the city hospital and the firefighting equipment at Overbrook Hospital for the Insane inadequate; and stated that the board of chosen freeholders should be held financially and morally responsible for any loss of life or property at this institution; and recommended that persons in the insane hospital not be permitted to use edged tools and machinery.
(23) At the September term, 1909, two presentments were returned. The first called attention to the confusing nature of the election laws and recommended that they be revised and that the control of elections be centralized; recommended that trolley cars be equipped with proper fenders to avoid fatal accidents; that the fire fighting equipment at public institutions be improved; that substantial window guards be provided at Overbrook hospital, that the administrative departments at Overbrook be reorganized and the supervising physician relieved from petty details; that adequate sleeping quarters for attendants be provided at the county penitentiary and for nurses at the isolation hospital; that police court judges dispose of minor cases without referring them to the grand jury; and that the almshouse be properly heated and adequate sanitary facilities provided. The second presentment recommended that the almshouse be abandoned and, until such time, that a more adequate system of fire protection be installed and that provision be made for better ventilation; recommended certain changes at the Newark City Hospital; recommended the installation of better fire fighting apparatus at the county jail; found the police force of the City of Newark to be inadequate and recommended the appointment of 50 additional patrolmen and the establishment of two additional precincts; suggested that appropriate legislation be enacted to permit the City of East Orange to increase its police force; pointed out the lack of adequate equipment of the Newark Fire Department and recommended the establishment of an additional fire station in the Forest Hill Section; recommended the extension of Branford Place to Springfield Avenue so as to relieve the traffic congestion at Broad and Market Streets; recommended that the present bath houses of the City of Newark be abandoned and that new ones be constructed; recommended that prisoners at the county penitentiary manufacture *55 clothing and implements for county institutions; called attention to the fact that an unidentified skeleton had been discovered in the attic of the South Orange Avenue asylum; criticized Dr. Dill, the superintendent of the institution, for failing to cooperate in the investigation with respect to the skeleton; criticized Dr. Dill for failing to cooperate in an investigation with respect to misinformation given relatives with respect to the death of a person in the county asylum; criticized Dr. Dill for his manner and attitude and expressed the opinion that he was utterly incompetent to fill his office and stated that it was of the opinion that he was incompetent both from a medical and from an administrative point of view; recommended the restoration of Sunday visiting hours at the insane asylum and also the employment of a competent dental surgeon for the treatment of inmates at the several county institutions.
(24) At the December term, 1909, the grand jury presented the board of chosen freeholders, both present and past, as being dominated by party loyalty and political expediency to public detriment; called attention to the favoring of contractors, architects and others engaged in the construction of the asylum at Overbrook for political and personal reasons and to the defects in construction at this institution; severely criticized the superintendent and supervisor of the asylum, finding them guilty of willful neglect of duty and expressing disapproval of the retention of these officials and regretting that the statute of limitations prevented it taking official cognizance of the nonfeasance and malfeasance in the management of the asylum; recommended that the management of the county institutions be removed from politics; recommended the employment of at least one person who speaks Italian in some official capacity in each city and county institution; pointed out the need for an Italian Detective Bureau in Newark; recommended that furniture and fixtures at the South Orange Avenue asylum be salvaged for use in other institutions; recommended the strict enforcement of the law regarding the sale of cigarettes to minors; recommended the enactment of a law preventing children under 16 from attending moving picture shows unless accompanied by parents or guardians; recommended fire escapes at the city hospital and at Overbrook hospital; and reported that there had been culpable carelessness in the keeping of records and criticized in general the supervision of the Orange Avenue hospital for the insane.
(25) At the April term, 1910, two presentments were returned. The first presentment called attention to the fact that there is a serious lack of harmony between the medical department and the executive department in the management of Overbrook asylum which needed immediate correction and recommended that the court appoint a commission to take over the management of the asylum and thus remove it from the realm of politics; found that the vacant South Orange Avenue asylum was depreciating rapidly as the result of neglect and recommended that it be put to use or sold; stated that *56 the new house of detention was unsuitable for its purpose and because of numerous defects had not yet been able to be put to use, and made recommendations to the board of chosen freeholders with respect thereto. The Public Service Railway Company was presented as being responsible for numerous accidents caused by trolley cars; attention of the appropriate authorities was called to the danger of pollution at the Cedar Grove reservoir; concern was expressed for the sudden disappearance of George Forman, auditor of the City of Newark, and it reported that his books had not been written up, that he was grossly negligent in complying with the requirements of his office, that for three years he had failed to render monthly balance sheets to the common council as required by law, and that although this fact was known to the members of the finance committee of the common council no member of that body took any action. It further found that George Forman was interested in several outside businesses which occupied a great deal of the time he should have been devoting to his duties as a city official. The grand jury pointed out that this situation existed in other departments of the city and county governments and recommended that dual office-holding be abolished and that all heads of city and county departments be compelled to devote their full time to their duties. The grand jury also discovered that the boards of street and water commissioners and other city departments had been violating the law in the purchase of supplies. The second presentment pointed out several deficiencies at the county jail; censured the board of chosen freeholders for failure to provide safeguards for the house of detention; expressed the opinion that requiring keepers at the county jail to work 14 hours a day including Sundays and holidays was unreasonable; that the isolation hospital was too crowded, needed a medical laboratory and a new wing for typhoid and measles patients; that the almshouse should have a new building in a different location; that trivial offenders should not be housed with hardened criminals at the county penitentiary; that fire escapes, open-air wards, and a nurses' home should be supplied at the city hospital; and criticized at length conditions at the county hospital for the insane. It found the superintendent of the institution utterly incapable of fulfilling the duties of his office and recommended his quick removal, and it further found that the present power of the hospital committee of the board of chosen freeholders was a detriment to the institution. The grand jury in the presentment recommended that the hospital be taken from the management of the board of freeholders, who had failed in their duties, and placed in the hands of a competent board of management or else under state control; that a more qualified medical superintendent be obtained and given plenary powers and be held solely responsible for the administration of the institution and that the warden be subject to his orders. In addition, the grand jury recommended that proper legislation be enacted whereby officials of the county who failed to perform their duties would be amenable to the criminal law so that in the future such occurrences would not go unpunished.
*57 (26) At the September term, 1910, the grand jury returned a presentment which pointed out the need for greater fire-fighting facilities at the county jail; that keepers of the jail were being required to work too many hours; that there was a need of fire escapes at the tuberculosis hospital and at the Newark City Hospital; pointed out that the present administration of the hospital for the insane at Overbrook had eliminated numerous causes of criticism which had existed in the past; recommended that the almshouse be provided a new building at a different location; that the laws with respect to fire escapes for tenement houses and factories be more strictly enforced; and recommended that certain city properties be utilized for an emergency hospital and ambulance station and for the board of health and that their present quarters be abandoned.
(27) At the December term, 1910, the grand jury returned a presentment dealing with a factory fire in which several lives were lost. It found the superintendent of the factory was guilty of poor judgment in attempting to extinguish the fire without first notifying the fire department and employees in the building; that the captain of No. 4 Engine Company made a serious mistake in judgment in not immediately turning in an alarm of fire; that the conduct at the fire of one of the firemen raised a question as to his fitness for his position; that the state factory inspector and his superior could not be too strongly condemned for their failure to report certain conditions which existed at the factory; that inefficiency existed in the operation of the Bureau of Combustibles; that the state laws with respect to construction of fire escapes needed to be materially changed; and that the state laws generally with respect to fire prevention measures should be strengthened. In addition, the grand jury recommended closer supervision of the construction and conditions of moving picture houses; pointed out certain defective conditions existing at the asylum at Overbrook; recommended that the almshouse be moved to a more suitable location; and condemned the morgue at the city hospital as a disgrace.
(28) At the December term, 1916, the grand jury returned a presentment stating that the psychopathic ward at the city hospital was inadequate and recommended that steps be taken to remedy the situation at once; and recommended that immediate steps be taken to improve the condition of South Orange Avenue from the car barns west to the city line.
(29) At the April term, 1917, the grand jury dealt at length with the condition of South Orange Avenue and the efforts that had been made to improve it, and expressed the opinion that it constituted a public nuisance attributable to the lack of prudence and incompetence of those in charge of the work. While finding no criminal charges were warranted, the grand jury criticized severely the plan of the work and the methods pursued and recommended that the proper authorities take further action.
*58 (30) At the December term, 1917, complying with a charge of the court, the grand jury presented the results of its investigation into the alleged neglect of duty on the part of the board of chosen freeholders with respect to the Essex County Hospital for the Insane at Overbrook. It set forth the facts at length in its presentment and expressed the opinion that they showed gross incompetence on the part of the governing authorities and great laxity in the administration of the affairs of Essex County and it severely criticized the board, its architects, and engineers with respect to the work done at the institution. It stated that it had been unable to extend the investigation into the question of whether or not moneys of the county had been corruptly and unlawfully expended and recommended that a further inquiry be made into this matter.
(31) At the September term, 1920, the grand jury handed up a presentment setting forth the results of its investigation into the causes of the high motor vehicle accident rate in the county and made recommendations with respect to improving the situation.
(32) At the December term, 1925, the grand jury in its presentment reported briefly and generally on the conditions in the county institutions which it had inspected as well as upon conditions in various institutions maintained by religious organizations. It concluded its presentment by remarking about the great improvement which had been effected in the equipment and management of the institutions in the county over the past ten years.
(33) At the September term, 1926, the grand jury in its presentment criticized the failure of the Public Service Transportation Company and of local officials, especially in Newark, to take adequate precautions for the public safety. It recommended that the Legislature enact statutes and, if necessary, that the Constitution of the State be amended so that corporations and their officials might be indicted and convicted for attempting to enforce company rules which jeopardized life.
(34) At the September term, 1927, two presentments were returned by the grand jury. The first dealt with the high automobile accident rate in the county and criticized again the Public Service Corporation for its failure to cooperate with the prosecutor and police officials in obtaining evidence against the operators of its vehicles who were responsible for accidents resulting in death, and it suggested that the incoming grand jury further look into the situation. The second presentment reported the results of its investigation into certain charges which had been made in the public press by the State Superintendent of the Anti-Saloon League to the effect that certain judges and police officials in the city were implicated in gambling. It found that the statements made in the public press were untrue and false, and without foundation in fact.
*59 (35) At the April term, 1931, the grand jury returned a presentment dealing with conditions in the various county institutions and recommended the building of a new city hospital.
(36) At the September term, 1932, the grand jury returned a presentment in which it found that the county board of elections, the superintendent of elections, the commissioner of registration, and the sheriff had failed to safeguard the conduct of the election, and it made certain recommendations with respect to the reorganization of the election machinery. It found that under the present system elections were interfered with or controlled by gangsters working in conjunction with both political parties and that district election boards were subject to manipulation, and it recommended that a commission be appointed by the presiding justice of the Supreme Court in the county to the end that elections be freed from political corruption.
As one reads these presentments the conviction grows that they have been a great force in bringing about many substantial improvements in public affairs which otherwise would have not come to pass or at least would have been long delayed. There can be no doubt that the use of grand jury presentments to call attention to public abuses was consistently recognized under the 1844 Constitution. Chief Justice Beasley and Chief Justice Gummere were too learned in the law and too experienced in public affairs to have permitted the handing up of such presentments had there been any question as to their legality in this State. In addressing the grand jury in Essex County in 1907, Chief Justice Gummere said:
"It is wise that a grand jury should consider the methods of administration of the county and city government and point out where there are defects and where improvement may be made. That is done in a presentment. The custom sprung up in this county under the late Chief Justice Depue, and it is due very largely to his wise administration of the law that this county enjoys such an excellent reputation in the administration of its public offices and for its integrity.
In dealing with this matter, however, you might bear in mind that a presentment is sometimes a cruel thing. When a man is indicted his character is attainted because the general public believes that he would not be indicted if he had not violated the law. If he is innocent, however, he has the opportunity to demonstrate it. Where a presentment besmirches the reputation of a man he has *60 not the opportunity to justify himself. He goes through life with a stigma, and there are no charges which he may meet. He is charged with matters not subject to the criminal law, although not looked on with credit.
A grand jury should be particularly careful in its presentment never to charge an individual with a wrong act that is detrimental to his character unless the proof is absolutely conclusive." 30 N.J.L.J. 306, 307.
I am sure that he did not mean to imply that presentments of the sort he was discussing were a new device in the law fashioned for the first time by his predecessor, Chief Justice Depue. Chief Justice Gummere was far too well informed to commit any such blunder. All he was saying was that Chief Justice Depue had deliberately utilized the presentment as to public affairs to improve the administration of government within his county by directing the attention of the grand jury to the investigation of specific matters of grave public concern, even where no crime was involved. Indeed, many of the grand jury presentments made to Chief Justice Gummere state that they deal with matters referred to the grand jury by the court. While there is always a danger, as Chief Justice Gummere pointed out, that a particular grand jury may abuse its prerogative (a subject we shall discuss later), none of the presentments we have examined give evidence of animus or oppression, but on the contrary each and every one of them appeared to have been in the public interest.
Mr. Justice Swayze did not hesitate to receive and file a presentment charging:
"We find in the City of Elizabeth an unusual state of affairs. The city is evidently governed in the interest of the brewery, saloon and liquor interests. The president of the common council is the president of a brewery. Several members of the common council are connected with the brewery interest. The common council has appointed an excise board, every member of which is pledged to the liquor interest. We are informed that one member secures all the insurance of the liquor saloons; all the cigars sold in the liquor saloons must be bought from another member, and all the painting and repairing must be done by another member. Even the members of the police force and the members of the fire department are appointed *61 for political reasons and are under obligation to this same appointing power. In other words, as stated above, the city is absolutely in the hands of the brewery and saloon interests." 30 N.J.L.J. (1907).
The matters dealt with by the grand jury in that presentment did not charge crime, but can there be any doubt of the great value to the community of having the situation made known to the public by an official body of the county that was equipped to investigate and find the facts accurately?
The only pronouncement we have found under the Constitution of 1844 that might be deemed to the contrary is part of a general charge of Mr. Justice Garretson to the grand jury of Camden County, 32 N.J.L.J. 81, 88 (1909), wherein he says: "Nothing is ever given to the Court that the Court cannot try." It would appear that he was not speaking of the kind of presentments of public affairs we are here discussing, but if his remarks were so intended they are manifestly contrary to the uniform current of authority and practice in this State and must be disregarded.
The question concerning presentments here under review came directly before the Constitutional Convention of 1947. The Committee on the Bill of Rights submitted to the Convention a draft embodying the exact language of Article I, paragraph 9 of the 1844 Constitution, insofar as presentments were concerned. Mr. Schlosser, counsel for the appellant here, as a delegate to the Convention moved to amend the paragraph by striking the words "presentment or," and in support of his amendment presented at length the position for which he is arguing here, 1 Proceedings of the New Jersey Constitutional Convention of 1947, 617-622. In answering Delegate Schlosser, Delegate Park, secretary of the Committee on Civil Rights, quoted from an opinion of the Attorney-General on the subject and Delegate Schenck, the chairman of the committee, advised the Convention that the entire law department, including Mr. Theodore Backes who had been Deputy Attorney-General for many years and who was distinguished for his knowledge of our constitutional law, participated *62 in the preparation of the opinion. This opinion was before the Convention when it voted down the proposed amendment and adopted Article I, paragraph 8, in the same form, so far as presentments and indictments and grand juries are concerned, as Article I, paragraph 9 of the Constitution of 1844. The opinion summarizes so well the practice in this State and the principles on which it is grounded as to require quotation:
"You ask our opinion on the following questions:
`(1) Would the proposal prevent a grand jury from making an independent inquiry and bringing in an indictment even though the prosecutor might not want it or be opposed to it?' Our answer to this is, no, it would not prevent a grand jury from making such an inquiry. The right of a grand jury to make an inquiry independently of the prosecutor of the county is an inherent common law right which is in no wise affected by this provision in the Constitution.
Your next question is: `(2) Would it limit the function of a grand jury to only those matters formally brought before the body?' Our answer to this is also in the negative, and the answer to the previous question partly furnishes the reason for the answer to this one. A grand jury also has the fundamental right to inquire into any matters which are pertinent to an exercise of its powers and is universally so charged by the court when entering upon its duties.
Your letter then proceeds to ask the further questions: (1) As to how frequently the procedure of `presentment' is actually invoked. I am not able to give your Committee actual statistical information as to how many presentments are returned by the grand juries of this State. I am sure, however, that I am safe in saying that while frequently grand juries return presentments into court, the number of presentments which are returned in comparison to the number of indictments are infinitesimal and negligible. I know that in many counties grand juries from time to time return presentments, not charging a crime, but usually calling attention to conditions which exist and which may or may not require further grand jury or investigatory action. Many times grand juries make presentments to the court concerning the operation of public institutions within the county, the condition of highways, etc.
You ask the question as to whether I know of instances where persons have been harmed by the procedure of returning a presentment. I do, in rare instances  the return of a presentment even though it does not charge a crime but charging public officials, for instance, with laxity or misconduct or other activity incompatible with the proper performance of their duties can, of course, and has, in instances, caused considerable harm to the individual named. However, *63 if the facts upon which the grand jury bases the presentment warrant the allegations therein, then the harm cannot be complained of as being unjustified. By the same token, a person may be greatly injured by the return of an unwarranted and unjustified indictment, as has happened many times, in cases where the evidence was so lacking as to not justify an indictment and requiring its being nolle prossed without going to trial, and yet, merely because the power of indictment has, at times, been used unwisely and even abused, no one would suggest eliminating from the Constitution the power of a grand jury to indict.
You then ask the further question as to whether or not the Department of Law believes that `the proposal would help or hinder the administration of justice.' In asking this question, you not only ask us for our legal opinion, but for our view on a matter of policy and I am going to take full advantage of your invitation by saying most emphatically that it is the very definite and considered judgment of my staff and myself that the adoption of this proposal and the elimination of the words `presentment or' from the constitutional provision would hinder the administration of justice in this State and would not be in the best interest of law enforcement.
As a matter of fact, from the earliest common law days, the words `presentment' and `indictment' have been considered to be synonymous. Blackstone says that `a presentment, generally taken, is a very comprehensive term; including not only presentments, properly so called, but also inquisitions of office and indictments by a grand jury.' Our criminal procedure statute, adopted as long ago as 1898 and still in effect, says that `the finding of an indictment' includes `the taking of an inquisition' and `making a presentment,' and the statute also defines the word `indictment' as including `presentment.'
In other words, we have in this State by statute adopted the common law principle that the words `indictment' and `presentment' are interchangeable. As a matter of practice, I know of no case in this State where a person has actually been brought to trial on a `presentment.' It is the established practice wherever it is sought to charge a person with a crime, to have prepared and voted by the grand jury an indictment. The test as to whether a paper handed to the court by the grand jury is an indictment or is not: Does it charge a crime and does it contain all of the constitutional requirements for an indictment? In other words, if the body of the paper was in every sense an indictment but was labelled on the back of it `presentment,' instead of `indictment,' the person charged therein with having violated the law could be brought to trial just the same.
The courts have long recognized the right of grand juries to make inquiry, either at the direction of the court and with the aid of the prosecutor or upon their own initiative, and to report their findings to the court by means of a presentment. It may very well be, as I am sure you can conceive, that a situation would arise whereby the *64 grand jury deemed it advisable to inquire into a certain situation; the prosecutor may disagree and may refuse to cooperate in that investigation; the grand jury may carry on its own investigation and if it finds that an indictment should be returned, it may first return a presentment to the court calling attention to its investigation and setting forth that a crime has been committed and requesting that an indictment be prepared, in which case it would be the duty of the prosecutor or some other officer of the court to prepare an indictment and submit it to the grand jury for its approval or disapproval. As a matter of fact, that was the practice under the common law.
Our grand juries are, of course, an arm of the court and therefore an essential part of the administration of justice. In view of the fact that as such they have the fundamental inherent right to return a presentment either with or without the constitutional provision of which we are speaking, certainly no harm could come to the individual by leaving the provision in the Constitution in the exact language in which it now is, and I repeat, in our judgment, to change this provision by taking out the words `presentment or' would take out of our Constitution a provision of the common law which has been in force in this State from colonial times and would tend to weaken the due administration of justice." 3 Proceedings of the New Jersey Constitutional Convention of 1947, 188-190.
The only change from the language of Article I, paragraph 9 of the Constitution of 1844 in Article I, paragraph 8 of the Constitution of 1947 results from the elimination of the justices of the peace, necessitating the deletion of the phrase in the new Constitution, "or in cases cognizable by justices of the peace." For this phrase was substituted "or in cases now prosecuted without indictment." These cases include a wide variety of actions for minor offenses, such as violations of the Disorderly Persons Law, or of ordinances or of regulations, and qui tam and other penalty actions. The question of the retention of presentments in the Constitution having been fully debated and the Constitutional Convention having been familiarized with the practice under the Constitution of 1844 through the Attorney-General's opinion, there can be no doubt that the Convention intended to have the practice theretofore existing with regard to presentments continued under the new Constitution. Moreover, from the debate and the opinion of the Attorney-General the members of the Convention knew that presentments in the criminal sense *65 were obsolete and that the word "indictment" alone would have safeguarded citizens against any possible danger from criminal informations. The retention of the words "presentment or" in the 1947 Constitution could only have meant that the Convention approved presentments of public affairs as they had been known in New Jersey from earliest colonial times.
We are not unaware of a respectable body of authority in other jurisdictions that frowns on the exercise by the grand jury of its common-law right to make presentments of matters of public concern unaccompanied by indictments. In some of these jurisdictions the powers of the grand jury are governed by statute and the problem there is solely one of statutory construction, but such is not the case here. A practice imported here from England three centuries ago as part of the common law and steadily exercised ever since under three successive State Constitutions is too firmly entrenched in our jurisprudence to yield to fancied evils. If presentments of matters of public concern were found necessary in the public interest in the relatively simple conditions of English and colonial life three centuries ago, how much more essential are they in these days when government at all levels has taken on a complexity of organization and of operation that defies the best intentions of the citizen to know and understand it. What is not known and understood is likely to be distrusted. What cannot be investigated in a republic is likely to be feared. The maintenance of popular confidence in government requires that there be some body of laymen which may investigate any instances of public wrongdoing. To be sure, the Legislature has the power to investigate any subject, but it is rarely exercised, and even when it is used it is seldom directed to the individual problems of local government. By the 1947 Constitution the Governor is given the power to investigate the conduct in office of any one in the executive branch of the State Government, Article V, Section IV, paragraph 5, but this power does not extend to local affairs. A group of 25 interested freeholders may seek *66 relief from official wrongdoing through an investigation of the affairs of a municipality or county, R.S. 40:6-1, but they may be, and generally are required to furnish a bond for the costs and expenditures of the investigation, R.S. 40:6-2, which are often substantial. Accordingly, the remedy is available only in extreme cases and even then the process has not proved generally satisfactory by reason of its expensiveness, the dilatory tactics that often accompany it, and the limitations imposed on the investigators by the terms of the statute. A single taxpayer may bring a suit to set aside any official action by reason of its illegality, but he does so at his own expense which may not be inconsiderable. Furthermore such suits do not in general reach official acts which, though improvident, fall short of being illegal.
Thus grand jury presentments of public affairs serve a need that is not met by any other procedure. The grand jury provides a readily available group of representative citizens of the county empowered, as occasion may demand, to voice the conscience of the community. There are many official acts and omissions that fall short of criminal misconduct and yet are not in the public interest. It is very much to the public advantage that such conduct be revealed in an effective, official way. No community desires to live a hairbreadth above the criminal level, which might well be the case if there were no official organ of public protest. Such presentments are a great deterrent to official wrongdoing. By exposing wrongdoing, moreover, such presentments inspire public confidence in the capacity of the body politic to purge itself of untoward conditions.
The chief objection to grand jury presentments of public affairs urged on us is that a public official or even a private citizen who is in some way associated with public affairs may have charges preferred against him which he may not be afforded an opportunity to answer. There is this possibility, but the danger is not confined to presentments. It is not infrequent for persons to be named in indictments without their being indicted, although they do not often complain *67 that they are not indicted with those who are. Many indictments, moreover, are never brought to trial. The dangers to a public official or a private citizen from unfounded presentments are far less than those attending the other forms of public investigations we have mentioned, by reason of the care with which grand juries are selected, the secrecy with which they deliberate and the judicial control of such presentments when they are handed to the court. Of course, if grand juries are selected on a partisan basis, partisan presentments might result. The remedy therefor is not to abolish presentments but to abolish partisan grand juries.
The acceptance of a presentment of public affairs, unlike that of an indictment, is not a ministerial act. The acceptance by the court of a presentment of public affairs is a judicial act. A reading of it may lead the court to give the grand jury further instructions with respect to the matters presented, which in turn may lead to further grand jury action. The court may ask to see or have read to it the grand jury minutes on a question presented. Thus, for example, if in a particular instance a grand jury should so far forget its oath as to bring in a false presentment out of partisan motives, or indulge in personalities without basis, the assignment judge has it within his power to strike the presentment or as much thereof as is palpably untrue, his action in such an event being subject to review for abuse of discretion by the state or any aggrieved person, including any member of the grand jury making the presentment. The experience of three centuries with the institution, however, indicates that such instances will be most infrequent.
The court always has and should act promptly on the receipt and filing of a presentment before the grand jury is discharged. Such presentments in the public interest are not made merely to be filed and published. It is also the duty of the assignment judge to instruct the clerk of the grand jury to send copies of the presentment to such public bodies or officials as may be concerned with the criticism and recommendations made in the presentment. It is interesting *68 to note in connection with the Essex County presentment abstracted in paragraph 17, supra, that there is a two-page memorandum of Chief Justice Gummere instructing the clerk of the grand jury to furnish to the board of health, the board of chosen freeholders, the county counsel, the board of street and water commissioners, the board of education and the board of aldermen the various parts of the presentment relating to each of them.

III
It remains to apply these principles and practices governing presentments to the case at bar. In the first place, the presentment handed up to the assignment judge by the Camden County grand jury is very obviously a presentment dealing with public affairs, in this instance the operation and management of the county jail. The presentment catalogued numerous irregularities, some venal, some vicious. The presentment is so clearly in the public interest that there can be no doubt of the duty of the grand jury to make it or of the assignment judge to receive and file it.
The order denying the motion to expunge parts of the presentment is affirmed.
OLIPHANT, J. (dissenting).
While I agree with the philosophy of the majority opinion I am led to the conclusion that under the facts exhibited in this case the complained of portions of the grand jury's presentment should have been expunged. Crimes are charged therein against an individual. He is condemned without an opportunity to be heard or being afforded any of the other safeguards which our democratic way of life afford those accused of criminal violations. It will remain as a matter of record for the rest of his life without even the hope of pardon (N.J.S.A. 2A:167-1) or excision (N.J.S.A. 2A:164-28), available to many actually convicted of crime. As Chief Justice Gummere pointed out in a charge to an Essex County grand jury:
*69 "* * * A presentment is sometimes a cruel thing. When a man is indicted his character is attainted because the general public believes that he would not be indicted if he had not violated the law. If he is innocent, however, he has the opportunity to demonstrate it. Where a presentment besmirches the reputation of a man he has not the opportunity to justify himself. He goes through life with a stigma, and there are no charges which he may meet. He is charged with matters not subject to the criminal law, although not looked on with credit." See 30 N.J.L.J. 306.
The county prosecutor should present the matters contained in the presentment to another grand jury in an endeavor to seek indictments for the crimes charged.
For affirmance  Chief Justice VANDERBILT, and Justices HEHER, WACHENFELD, BURLING, JACOBS and BRENNAN  6.
For reversal  Justice OLIPHANT  1.