34 N.J. 378 (1961)
169 A.2d 465
IN THE MATTER OF THE PRESENTMENT MADE TO THE SUPERIOR COURT OF NEW JERSEY, CAMDEN COUNTY, BY THE CAMDEN COUNTY GRAND JURY, 1959 TERM, FIRST STATED SESSION, ON OR ABOUT JUNE 7, 1960.
ALFRED R. PIERCE, PETITIONER-APPELLANT.
The Supreme Court of New Jersey.
Argued December 6, 1960.
Decided March 21, 1961.
*382 Mr. Norman Heine, Camden County Prosecutor, argued the cause for the County.
Mr. William G. Bischoff argued the cause for petitioner-appellant (Mr. William G. Bischoff, and Mr. Thomas D. McBride, of the Pennsylvania Bar, attorneys).
The opinion of the court was delivered by FRANCIS, J.
This appeal (which we certified on our own motion prior to argument in the Appellate Division) challenges the legal propriety of the action of the Superior Court Assignment Judge of Camden County, in refusing to expunge certain parts of a Grand Jury presentment.
In November 1959 the New Jersey State Police, at the direction of the Attorney General, conducted raids at 17 locations in the City of Camden and arrested a number of persons engaged in gambling activities. The information which stimulated the intervention of the State authorities was furnished to the Attorney General by petitioner, Alfred R. Pierce, the Mayor of the City, who at that time was also serving in the capacity of Director of Public Safety. He had been designated Director of Public Safety by his City Commission colleagues on May 19, 1959, under the Commission form of government existing in Camden. Immediately after the raids, Pierce requested a Grand Jury investigation into gambling activities in the city and their connection with the Police Department. The investigation was undertaken and out of it grew the document under attack.
On June 7, 1960 the Grand Jury handed up the presentment to the Assignment Judge. After examination, he ordered it filed as a public record and authorized its distribution to the Governor, Attorney General, Administrative Director of the Courts, members of the Legislature, municipal and County Judges of Camden County, and petitioner, as Mayor and Director of Public Safety of the City of Camden. The County Clerk recorded it as filed on June 7, 1960, at *383 11:03 A.M. On June 9, 1960 Pierce was relieved of his post as Director of Public Safety by his colleagues on the City Commission. According to the verified petition in this proceeding, he received a copy of the presentment in the mail on June 15, 1960.
The presentment, we were advised at the oral argument, was drawn by the Prosecutor after conferences with the Grand Jury. It criticized Pierce (by inescapable imputation) for failing to consult the County Prosecutor before enlisting the aid of the Attorney General in connection with the November 1959 raids. It pointed out that these raids produced "evidence * * * tending to show that a substantial number of City police might have been receiving various amounts from the gambling interests for the ostensible purpose of protecting these gambling activities." But it suggested also that if this evidence "had been fully investigated and developed before the demand was made [by Pierce] that this Grand Jury undertake its investigation," a "great deal more could have been learned and dealt with in a more positive fashion." This section of the document, which was entitled "Premature Investigation," expressed the view that the gambling activities could not have been carried on without the knowledge of the local police, but that the Grand Jury lacked legal proof to indict "those who might have given, as well as those who might have received, graft, bribes or favors to permit or tolerate the carrying-on of these gambling activities * * *."
In other sections of the presentment various recommendations were made with respect to (a) adoption of statutes granting immunity from prosecution in such cases to persons who hinder investigations by pleading the Fifth Amendment, (b) establishment of a requirement for the completion periodically of financial questionnaires by members of the police department, (c) administration of the police department, and (d) the proper use of search warrants. Included also were the statements that "We have returned all the indictments that, in our opinion, were fit and proper," and *384 "with this presentment we consider our investigation completed."
In the course of the report the Grand Jury censured Pierce by implication for certain conduct engaged in or allegedly engaged in by him before and during the investigation. On June 20, 1960 he served on the Prosecutor a notice, supported by verified petition, that he would apply to the Assignment Judge for the expurgation of three such censorious statements. The petition asserted that the censure was unwarranted, untrue and defamatory, and as to the assertion of untruthfulness specific facts were set forth. No answering affidavit or record was filed by the Prosecutor. The petition requested the court to examine the presentment, the minutes and record of the Grand Jury; to inquire into the truth of the statements in the presentment and "ascertain the true facts" as well as the justice of the presentment, and to expunge the parts thereof recited in the petition.
On the return day of the motion, counsel for Pierce moved to expunge the following three portions of the presentment:

(1)
"Information leading up to the raids was furnished to the Attorney General by the Director of Public Safety of the City [meaning Pierce]. Some of the raided premises, as well as the persons involved, and the illicit activities they had carried on had previously been reported to the Attorney General who informed the County Prosecutor thereof. The County Prosecutor, in turn, passed on this information to the Director of Public Safety and city police, with the request that action be taken.
In face of these facts this Grand Jury is at a complete loss to understand why the Director of Public Safety did not consult with the County Prosecutor concerning the proposed action prior to laying the matter before the Attorney General, but rather consulted with persons who were strangers to any agency connected with law enforcement." (Insertion supplied.)

(2)
"Suppression of Evidence.
Subsequent to the presentment of the indictment against the former Chief of Police, Gustav Koerner, the Director of Public Safety, for the first time, brought to the attention of this Grand Jury and *385 the County Prosecutor, certain evidence favoring the said Gustav Koerner. This evidence, had for a long time, been in the possession of the Director of Public Safety. No satisfactory explanation has been advanced why this evidence was suppressed from this Grand Jury and the County Prosecutor, notwithstanding the Director of Public Safety was aware that this Grand Jury was investigating the official conduct of the said Gustav Koerner as Chief of Police of the City of Camden."

(3)
"It further appears that prior to the State Police raids, the patrol division was comprised of uniformed and non-uniformed officers. These non-uniformed officers, or plain clothesmen, were detectives assigned to the patrol division and known as district detectives. These district detectives handled practically all investigations and complaints concerning gambling and vice. For practical purposes, they constituted a vice squad without such title. These men were soon well known to the gambling fraternity and proved an ineffectual means of combatting the gambling element. Although their record was shameful, they were allowed to continue in the same capacity."
The general basis for the motion was that the presentment, and particularly the parts specified, were improper, unwarranted, untruthful and defamatory. At the outset of the argument an effort was made on behalf of Pierce to introduce evidence in support of those grounds. The court refused to permit that course to be taken and required his counsel to proceed as if the problem presented were one of law alone. The result was that the lengthy attack on the presentment was a mixture of law and statements and counter-statements of fact by both parties without the slightest effort on the part of the court to follow the normal judicial pattern for resolving the controversy. The court did not call for and examine the Grand Jury minutes or permit Pierce and his counsel to examine those minutes as an aid in determining the truth of the various factual allegations made in the oral argument of the parties, or the truthfulness of the charges in the presentment. Nor was any consideration given to the basic problem of whether the three critical statements sought to be excised were proper matters for inclusion in a presentment.
*386 At the conclusion of the argument the court quite obviously accepted the Prosecutor's contention that his sole duty was to examine the face of the presentment for "palpably untrue" statements of fact, or obvious partisan motive, and if such falsity or motive was not manifest within its four corners, the motion should be denied. The oral opinion summarily refusing the relief sought reveals that the judicial function was considered discharged by a study of the presentment to ascertain if it related to public affairs and to alleged non-indictable official misconduct associated therewith. In his judgment, such facts appearing, no study of the Grand Jury minutes was necessary or proper to determine whether the statements and censure were partisan emanations, or whether the testimony contained therein established the truth of the facts asserted; nor did he recognize any obligation to receive proof from petitioner as to falsity of the alleged assertions, no matter how incontrovertibly false the proffered proof would show them to be. That view almost reduces the judicial function to a ministerial act. Falsity obvious enough to be manifest on the face of a presentment would be an infrequent occurrence; partisan motivation might be somewhat more susceptible of demonstration because of the language used, the conclusions asserted and the nature of the censure imposed. The instances would be rare indeed, however, where the duty of the court in such a sensitive area could be properly discharged simply by looking at the paper and the words it contained.
In re Camden County Grand Jury, 10 N.J. 23 (1952), does not support such a narrow view of the trial court's function. No pronouncements were made in that case as to the procedure to be followed by an aggrieved person seeking the suppression in whole or in part of a presentment; nor did it appear that any testimony was offered before the Assignment Judge for the purpose of establishing falsity of statements contained therein. The opinion did point out, however, that when a presentment "of public affairs" is handed up to an assignment judge, acceptance thereof is *387 not a ministerial but a judicial act. Id., 10 N.J., at p. 67. A duty exists to study it, to ascertain if the matters included may properly be the subject of a presentment, or are false, or bespeak partisan motivation or improper indulgence in personalities. Moreover, the court said the grand jury minutes could be called for and studied as an aid in reaching a decision as to suppression or filing. The ultimate determination requires the exercise of sound discretion by the assignment judge and his action is reviewable for mistaken application thereof. See 10 N.J., at p. 67.
Subsequent to In re Camden County Grand Jury, supra, this court amended R.R. 3:3-9 to regulate the prefiling practice with respect to presentments. R.R. 3:3-9(b) requires that a presentment be returned in open court and that the assignment judge be notified in advance so that he may be available to receive it. Subsections (c), (d) and (e) provide:
"(c) Promptly and before the grand jury is discharged the Assignment Judge shall examine the presentment. If it appears that a crime has been committed for which an indictment may be had, he shall refer the presentment back to the grand jury with appropriate instructions. If it appears that the presentment is false, or is based on partisan motives, or indulges in personalities without basis, or if other good cause appears, he shall strike the presentment either in full or in part. As an aid in examining the presentment the Assignment Judge may call for and examine the minutes and record of the grand jury.
(d) Such portions of the presentment as are not referred back to the grand jury for further action or are not stricken in accordance with paragraph (c) of this Rule, shall be filed and made public * * *.
(e) The action taken by the Assignment Judge pursuant to this Rule is judicial in nature and is subject to review for abuse of discretion by the State or by any aggrieved person, including any member of the grand jury making the presentment."
It is apparent from the language of the rule that it is a paraphrase of parts of the Camden opinion and that it is intended to be a guide rather than a full and complete regulation of the subject.
*388 Before entering upon a discussion of the significance of the rule, certain observations as to the function and limit of propriety of presentments seem advisable for purposes of perspective. Originally such documents were delivered to the appropriate court after knowledge of criminal activities had come to a grand jury's attention through its own independent investigation or study or otherwise, but without the intervention of the prosecutor and without any action or recommendation on his part in pursuit of an indictment. The presentment then served to call the criminality to the notice of the proper authorities and to authorize or to request the preparation of an indictment. It operated as an accusation upon which the prosecutor ordinarily was expected to act. See In re Hudson County Grand Jury, 14 N.J. Super. 542 (Law Div. 1951); Commonwealth v. Green, 126 Pa. 531, 17 A. 878 (Sup. Ct. 1889); Dession & Cohen, "The Inquisitorial Functions of Grand Juries," 41 Yale L.J. 687, 705 (1932); Comment, "Legality of the Grand Jury Report," 52 Mich. L. Rev. 711 (1954). This is undoubtedly the sense in which the term was first used in the New Jersey Constitution of 1844. Art. 1, par. 9. The practice grew up, however, for grand juries to make an occasional "report" containing comments or criticisms on the state of public affairs or conditions in a particular area or on matters of general interest. It was a written communication  an "impersonal broadside" (Dession & Cohen, supra, at p. 705) calling attention to matters of public concern but charging no crime and reciting no facts upon which an indictment could be framed. In re Hudson County Grand Jury, supra, at page 545; In re Report of Grand Jury of Baltimore City, 152 Md. 616, 137 A. 370 (1927); Comment, "Legality of the Grand Jury Report," supra, at p. 715. A typical example of such reports appears in In re Monmouth County Grand Jury, 24 N.J. 318 (1957). In this State, however, the term "report" long since was assimilated into "presentment" and the original connotation of the latter word has fallen into disuse.
*389 In this jurisdiction reports of the presentment type have been held to serve a valid purpose. In re Camden County Grand Jury, supra. When discreetly used, they are regarded as serving a public purpose if they refer to public affairs or conditions, and even if they occasionally censure public officials whose association with the deprecated public affairs or conditions is intimately and inescapably a part of them.
It is in connection with censure of public officials that such presentments most frequently come under attack. Many jurisdictions refuse to permit them, restricting the sphere of grand jury action to indictment if evidence of crime exists, or silence otherwise. See Wood v. Hughes, 9 N.Y.2d 144, 212 N.Y.S.2d 37, 173 N.E.2d 23 (Ct. App. 1961); Application of United Electrical, Radio & M. Workers, 111 F. Supp. 858, 866 note 26 (D.C.S.D.N.Y. 1953). The issue is viewed as one of power, truth or falsity being immaterial. In re Hudson County Grand Jury, supra; Application of United Electrical, Radio & M. Workers, supra; Dession & Cohen, supra, at p. 709. The reason for that view stems in part from an awareness of the motives which gave birth to the inquisitorial body, i.e., to act as a shield against the oppression of governmental authorities by means of false accusations of crime, as well as an agency for bringing law breakers to trial. Moreover, traditionally grand jury proceedings are secret, R.R. 3:3-7; N.J.S. 2A:73-3, and presentments, incorporating facts and naming or describing persons taken from ordinarily inviolate testimony, are departures from that basic safeguard and should not be engaged in unless public benefit or service provides sound justification.
But there is a more fundamental reason for imposing restraint upon the privilege of a grand jury to hand up presentments reprobating a public official by name or inescapable imputation, where no evidence warranting indictment for crime has been submitted to it. When an indictment is returned, the official becomes entitled to a trial. *390 He has an opportunity to face his accusers and to achieve public exoneration from a court or jury. Not so with a presentment. It castigates him, impugns his integrity, points him out as a public servant whose official acts merit loss of confidence by the people, and it subjects him to the odium of condemnation by an arm of the judicial branch of the government, without giving him the slightest opportunity to defend himself. Such a presentment unless thoroughly justified is a "foul blow. It wins the importance of a judicial document; yet it lacks [the] principal attributes [of such a document]  the right to answer and to appeal. It accuses, but furnishes no forum for a denial. No one knows upon what evidence the findings are based. An indictment may be challenged  even defeated. The presentment is immune. It is like the `hit and run' motorist. Before application can be made to suppress it, it is the subject of public gossip. The damage is done. The injury it may unjustly inflict may never be healed." People v. McCabe, 148 Misc. 330, 266 N.Y.S. 363, 367 (Sup. Ct. 1933). To recognize complete freedom in grand juries to censure public officials, when at the same time they acknowledge a lack of evidence of criminality on which to indict, is to confer on them the absolute right to establish their own standards of right and wrong and of public and private morality, and to impose those standards on such officials without any responsibility for their abuse. Application of United Electrical, Radio & M. Workers, supra, 111 F. Supp., at pp. 867-869; Ex parte Robinson, 231 Ala. 503, 165 So. 582 (1936). Such freedom would subvert the very principle they were created to protect.
As has been mentioned, In re Camden County Grand Jury, supra, provides support for reprobatory presentments relating to public affairs and matters of general public interest even though officials connected therewith or said to be responsible therefor are incidentally identified by name or otherwise. The proposition is acceptable that a grand jury may investigate conditions or offenses affecting the morals, *391 health, sanitation or general welfare of the county, as well as county institutions, buildings and departments, and make presentments concerning them. But the Camden decision does not attempt to specify the precise limits of the jury's authority. The plain implication, however, from the authorities generally, is that the subject must be a matter of general public interest, or relate to some aspect of public affairs, or to some public evil or condition to which, in the discretion of the jury, the attention of the community should be directed. And censure of a public official is permissible only where it may be said with absolute certainty that his connection with the condemned matter is such that its existence is inextricably related to non-criminal failure to discharge his public duty. More particularly and by way of further qualification, the criticism of the individual is allowable only where it is integrally associated with the main purpose of the report, i.e., to draw critical attention to some undesirable condition in the affairs of the public. See State ex rel. Brautigam v. Interim Report of Grand Jury, 93 So.2d 99 (Fla. Sup. Ct. 1957). The presentment cannot be used to single out persons in private or official positions and impugn their motives, or by word or innuendo hold them to scorn or to censure. It cannot simply accuse, and by the device employed compel the accused to stand mute. The jury cannot "forage at will upon any whim it may entertain." In re Monmouth County Grand Jury, supra, 24 N.J., at p. 324. The probability of damage to the reputation of public officials far overshadows any benefit the public might receive from such an unlimited license. A weighing of the public and individual interests involved, in our judgment, leads irresistably to acceptance of the view expressed in 1907 by Chief Justice Gummere that a grand jury should be particularly careful never to charge an individual with improper conduct or acts detrimental to his character unless the proof is conclusive. Charge to Grand Jury, 30 N.J.L.J. 306, 307 (O. & T. 1907).
*392 According to both the Camden case and R.R. 3:3-9, acceptance and filing of a presentment by the assignment judge are judicial acts. The observations made above show the considerations that must enter into their determination. If those considerations are ignored then there is no exercise of judicial discretion; simply an act of automatism. The decision must be made with an awareness of the basic right of the citizen to be free from official disapproval; that where he has committed no crime he should not be pilloried. It must be made with the understanding that once the presentment is ordered filed and thus publicized, even a subsequent successful motion to expunge all or parts of it from the record is sometimes a hollow victory. And it must be made with the knowledge that the duty of the courts is to provide all possible safeguards for every citizen whether the highest or the humblest, in the protection of his good name and reputation. There is nothing runic about judicial discretion. It signifies sound discretion guided by law so as to accomplish substantial justice and equity. It is a magisterial, not a personal, discretion. State by Parsons v. Standard Oil Co., 5 N.J. 281, 308 (1950); Lebel v. Cyr, 140 Me. 98, 34 A.2d 201 (Sup. Jud. Ct. 1943). So tested, the decisions in the present case both as to filing the presentment and in denying the motion to expunge, reached as they were simply by an examination of the presentment itself, did not satisfy the demands of judicial discretion.
In the existing state of the law and under R.R. 3:3-9 the first obligation of an assignment judge on receiving the report is to determine whether the matters contained therein are the proper subjects of a presentment. If not, it should be suppressed to the extent of the impropriety. If it reprobates a public official or officials, careful examination and study are required, first to determine if the general subject of the presentment is a condition of public affairs which is inimical to the best interests of the community, and if the criticized conduct of the public official is intimately related in cause to the condition. Occasionally the line of *393 demarcation between a legitimate report and one which unfairly reprimands a public official without returning an indictment may be difficult to draw. But that is no reason for ignoring it or failing to observe any line. Where permissible limits are exceeded, the duty of the court to expunge the objectionable matter is unavoidable; the grand jury as an arm of the court cannot be permitted to overreach. State ex rel. Brautigam v. Interim Report of Grand Jury, supra, 93 So.2d, at p. 103.
In the present case the subject of the presentment was the existence of gambling in Camden County and the knowing tolerance of it by police authorities. If the evidence uncovered by the Grand Jury was clear that gambling did in fact exist and that some members of the Police Department were knowingly quiescent about it, a report thereon would appear to be within the ambit of the inquisitorial body's legitimate function, even though adequate proof to indict particular individuals had not been made available. It should be noted that even in such a situation the assignment judge ought to make certain that the language was not employed in such manner as to point to or suggest the criminal involvement of a particular official against whom no indictment had been found. So it may be conceded here as a general proposition that the topic as well as the recommendations for control of it were proper for a presentment.
A conclusion that the topic is legitimate, however, does not dispose of the problem. A charge of tolerance of the crime of gambling by a police department obviously should not be lightly made. Support for it cannot be found in the presentment itself. Therefore, before accepting it and before discharging the grand jury, proper exercise of discretion by an assignment judge calls for examination of the grand jury minutes with or without the aid of the foreman or the prosecutor, at least to the extent of satisfying himself that a substantial foundation existed to justify the public report. In this kind of situation how else can it be determined under R.R. 3:3-9(c) if it is false, or based upon partisan motives or unwarranted for "other good cause"?
*394 At this juncture it is appropriate to take up the first part of the presentment challenged and sought to be excised. As set forth in (1) above, it censured Pierce for consulting with persons (unnamed by the Grand Jury) who were said to be strangers to any agency connected with law enforcement and then, without consulting the Prosecutor, furnishing the information to the Attorney General which resulted in the raids on gambling establishments. The Grand Jury expressed itself as "at a complete loss" to understand Pierce's conduct. In our judgment, the suggestive and insidiously sinister statement has no place in this presentment. It smacks of a carping and seemingly partisan reprobation which is wholly incompatible with the independence to be expected of a grand jury acting solely in the public interest. It has no proper relation to the basic evil sought to be brought to public attention. The legitimate area of operation of the jurors does not comprehend the imposition of their judgment as to the course of conduct which should have been pursued under the circumstances by Pierce before enlisting the aid of the Attorney General. The fact remains that the path taken resulted in raids which produced substantial evidence of gambling in the city. Irrespective of whether in the post-event view of the grand jurors another tack might have enhanced the results, such fact could not justify the public condemnation sought to be visited upon him. No motion should have been necessary to expunge the two paragraphs set forth under (1). They should have been suppressed before filing by the Assignment Judge. But that not having been done, when the motion was made after the order for filing there was no need for the taking of testimony thereon. It should have been granted because the censure was improper on the face of the presentment.
The second portion of the presentment sought to be expunged, (2) above, falls into the same category. It is designated "Suppression of Evidence" and charges that after *395 the Grand Jury had indicted the former Chief of Police, Gustav Koerner, (for an offense not named in the presentment) "certain evidence" favoring him was brought to the jury's attention. It alleges that the favorable evidence had been in Pierce's possession for a long time but was not given to the jury despite his knowledge that the Chief of Police was under investigation. And it says that "No satisfactory explanation" had been advanced for the "suppression." Such a subject is wholly foreign to the purpose of a presentment. It is not a matter of general public interest or a condition of public affairs. The criticism simply relates to a specific event alleged to have occurred in the course of testimony given as an incident of the investigation.
There is no intimation that whatever this "favorable" evidence may have been, it would have made any difference as to the indictment that was returned; nor was it suggested that the Prosecutor seek a nolle prosequi on the basis of the "favorable evidence." The testimony and circumstances surrounding the transaction are not set forth; the full facts are not recited so as to permit an appraisal of the entire matter or to permit an evaluation of the conclusion of the Grand Jury allegedly drew from the testimony. Obviously, on the Grand Jury's own statement, no criminal act by Pierce was involved. The alleged "suppression" is denied by Pierce's verified petition, which remains without any proper answer by the Prosecutor. In any event the excursion into such a collateral matter for the purpose of censuring Pierce publicly was an improper use of the presentment process. Alone or in combination with the criticism leveled at him for calling on the Attorney General to enforce the gambling laws, it points persuasively either to partisanship or lack of understanding of the function of such a report. Although the strict oath of the grand jurors to keep secret the testimony and proceedings before them may be relaxed for purposes of a proper public report, it cannot be violated in order to criticize an individual on a clearly collateral aspect of the investigation. The sworn duty of the jurors *396 was to indict if some incidental crime was committed before them during their inquiry, not to issue statements representing an ex parte conclusion condemnatory of an individual whose acts by their own statement did not constitute cause for indictment. See Application of United Electrical, Radio & M. Workers, supra, 111 F. Supp., at pp. 866, 867; cf. In re Report of Grand Jury of Baltimore City, supra; State ex rel. Strong v. District Court of Ramsey County, 216 Minn. 345, 12 N.W.2d 776 (Sup. Ct. 1944). Such reprobation clearly tends to deprive Pierce of his good name and to besmirch his character. In effect, it convicts without a trial and without the opportunity of making a defense in an impartial and responsible court, a result so unfair and so repugnant to the ideals of justice as to merit judicial disapproval.
The views expressed make it plain that the second objection to the presentment was well taken. The particular censure not being properly includible in the presentment and the fact appearing plainly on the face of the document, a proper exercise of discretion required that it be stricken therefrom before filing. Under the circumstances there was no need to receive the proof offered by Pierce in support of the motion to strike. Moreover, even if the court, after examining the criticism, felt doubt as to its propriety, the rule expressed by Chief Justice Gummere, which is described above, should have been applied. An individual being involved, as distinguished from a condition unfavorably affecting the community, censure was improper unless the supporting proof was conclusive. The fact could be ascertained at that stage of the proceedings only by an examination of the Grand Jury minutes, a course which was not adopted.
This determination does not conflict with the fundamental rule of the Camden case. We agree that it was proper for the grand jury there to report upon the improper conditions prevailing in the county jail. They clearly portrayed maladministration and were properly brought to public attention in that fashion, so long as the evidence was not sufficient to *397 warrant indictment. A matter of general community interest being involved, the presentment process was open to the grand jury as a vehicle for focusing the public eye upon it. The same may be said for the report in this case so far as it comments upon the existence of gambling in Camden County.
One aspect of the Camden case, however, must be noted. The jail being under the supervision and control of the Sheriff, disclosure of the conclusively shown deplorable conditions described in the presentment could not have been made without expressly or impliedly pointing at him. Accordingly, the personal reference to him in connection with the existence of the conditions was within the permissible sphere of the grand jury's function. But the report contained comments, conclusions and evaluation of the testimony given by the Sheriff during the investigation. He was characterized as a "poor witness whose testimony was evasive and lacking in cooperation"; conclusions were set forth as to the motives of the various public officials and employees in giving their testimony, and it was said that the Sheriff "rates the strongest kind of moral indictment." The propriety of such condemnation does not appear to have been given specific treatment in the opinion. In our judgment, comment of that nature is improper and exceeds the limits of a proper presentment. A grand jury transcends its powers when it reprobates and disparages an individual on the basis of its opinion of the testimony he gave on appearance before it. The manner in which his testimony was given, its exact content, the testimony of other witnesses on the basis of which the unfavorable opinion may have been reached, the reasoning process of the jury in arriving at its conclusion, all are known only to the grand jurors. When a crime is charged against a person, well known tests furnished by the court are applied. These may be contrasted with the subjective standards of ethics, individual notions of morality and sufficiency of evidence which influence a grand juror to censure a person for non-criminal *398 conduct. See State v. Bramlett, 166 S.C. 323, 164 S.E. 873 (Sup. Ct. 1932); Comment, "Legality of the Grand Jury Report," supra, at p. 719.
In Application of United Electrical, Radio & M. Workers, supra, the grand jury returned a presentment castigating thirteen union officials (without naming them) who pleaded the privilege against self-incrimination when asked as to the truth or falsity of non-communist affidavits they had filed with the National Labor Relations Board. After asserting that evidence had been received "to the effect that a number of responsible officials" of the unions involved "have long histories of Communist membership and activity," it recommended that the Board revoke the certification of the unions involved. In expunging the offensive material, the District Judge said:
"In effect, the individual petitioners are accused of filing false affidavits. And the accusation, coming as it does, from a quasi-judicial body which occupies a position of respect and dignity in the community, carries greater weight than a similar charge from a private person. The widespread publication of the charges and the identification of petitioners as the offenders subjected them to public censure to the same degree as if they had formally been accused of perjury or conspiracy. At the same time it deprived them of the right to defend themselves and to have their day in a Court of justice  their absolute right had the Grand Jury returned an indictment. * * *." 111 F. Supp., at p. 861.
Finally, on this phase of the matter a comment of the County Court in Application of Lundy, 208 Misc. 833, 148 N.Y.S.2d 658, 668, 669 (1955), seems worthy of mention:
"* * * As for the alleged willful deception practiced by petitioners, the Grand Jury has, as already pointed out, found no indictment. Neither have they presented a finding directing the prosecution of anyone for any other crime. They have not applied to the court for instruction, and, presumably, have found no cause to accuse anyone of perjury in any degree. If perjury was committed, those responsible should be prosecuted therefor. If not, they may not be accused without an opportunity to defend themselves. Needless to say, the alleged deception, if it occurred, was not an act of a public official in the administration of the business *399 of his office. It was an incident of the investigation. It was not, therefore, properly incorporated in the report. * * *."
Accordingly, to the extent that the Camden case may be considered as opposed to the views herein expressed, it may no longer be regarded as authoritative.
The third part of the presentment, (3) above, to which objection was made, asserted that prior to the State Police raids certain "district detectives" who were assigned to the "patrol division * * * handled practically all investigations and complaints concerning gambling and vice." And it went on to charge that "Although their record was shameful, they were allowed to continue in the same capacity."
The respect in which the conduct of these detectives was "shameful" is not specified. Presumably the intention was to refer back to the first section of the report which, in speaking of the raids, said: "During the course of the raids, evidence was acquired tending to show that a substantial number of the City police might have been receiving various amounts from the gambling interests for the ostensible purpose of protecting these gambling activities." (Emphasis added.) Despite the guarded and equivocal nature of that expression, the clear import of the challenged language is that after the raids, Pierce, who became Director of Public Safety on May 19, 1959, and who brought about the Attorney General's intervention, continued in charge of enforcement of the gambling laws the very detectives whose record was "shameful."
The odium of that accusation is obvious. If the evidence in support of it was not conclusive, it should not have been uttered. Whether it was false or the proof of its truth conclusive cannot be determined from a mere study of the presentment itself. Thus, when Pierce desired to offer proof of falsity, and also requested that the Grand Jury minutes be called for, the action of the Assignment Judge in declining to adopt either course was clearly improper. *400 The effect of the refusal was to force Pierce to bow to the condemnation without ever having the opportunity to be heard; it sanctioned the punishment of a public reprimand based on secret ex parte proceedings which are not amenable to informed public evaluation. Such a result is wholly incompatible with democratic process. Under our form of government much power has been given to the judiciary by the people of our State through the Constitution. They have put their faith and hope and trust in the independence of the judges who are called upon to exercise that power, and in their willingness to act as guardians of the rudiments of fair play. As Justice Frankfurter put it in his concurring opinion in Joint Anti-Facist Refugee Comm. v. McGrath, 341 U.S. 123, 170, 71 S.Ct. 624, 95 L.Ed. 817, 853 (1951):
"The heart of the matter is that democracy implies respect for the elementary rights of men * * *; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts, decisive of rights." (Emphasis added)
Under the circumstances when the Assignment Judge reached this portion of the presentment in the course of his original examination of it, he should not have approved it for filing without first perusing the Grand Jury minutes to ascertain if the accusation rested on proof of adequate probative value. At the time exercise of his judicial discretion was invoked, R.R. 3:3-9(c) provided that if falsity of the assertion appeared the presentment should be stricken in whole or in part. As has been indicated, obviously no acceptable judicial conclusion on that subject could have been reached from the language employed alone. It is of no consequence on the present appeal that we have now adopted a more stringent test for determining whether part of a presentment on a matter of general public concern should be deleted because it impugns the integrity of an individual. No examination of the Grand Jury minutes having been engaged in here, manifestly the trial court's *401 order would have been the same whether the criterion for decision were the existence of conclusive proof of the facts on which the censure was allegedly based, or the falsity of such facts. For future guidance, however, R.R. 3:3-9 will be revised.
In any event, when the motion to expunge was argued and counsel for Pierce offered to prove the falsity of the critical statement, not only did R.R. 3:3-9(c) entitle him to that right but even in the absence of any such procedural rule, ordinary fair play required that the opportunity be accorded to him. Moreover, to that end he should have been allowed to examine the Grand Jury minutes fully (under such reasonable supervision as the court deemed advisable). While secrecy of grand jury proceedings is traditional, when presentments reprobating a public official are returned the veil can no longer be regarded as sacrosanct. It has been suggested that in some counties the minutes are not taken stenographically. Since a presentment publicly reprimanding a public official is so fraught with danger to reputation and even ability to continue in public life, the choice is clear. If a full record of the testimony and exhibits is not made, no report of that character can be accepted for filing.
Therefore, Pierce's third objection to the presentment must be remanded to the trial court for action in conformity herewith. More specifically, on return of the record the trial judge may examine the minutes himself preliminarily, in the light of this opinion. If upon such examination it appears that the evidence supporting the censorious comment is conflicting or susceptible of diverse inferences, or if any doubt exists in his mind as to whether the supporting facts are conclusive, the challenged portion of the report should be suppressed or expunged.
If, however, after this ex parte study, decision is reached not to disturb the criticism, the matter should then proceed to hearing on Pierce's motion. Such a hearing should not be considered as a trial; it does not invoke the *402 ultimate fact-finding function of the court; problems of credibility cannot be decided. Pierce should be permitted to examine the complete Grand Jury minutes (subject to any reasonable safeguards deemed necessary by the court) in aid of his effort to show lack of proof of the required degree of probative force. He should be permitted also to introduce additional evidence to expose that deficiency. But no witnesses may be produced by any person or party in support of the presentment. At the close of the hearing, if it then appears that the facts in the Grand Jury minutes on which the condemnation is based are not true, or are in conflict or are productive of diverse inferences, or if a reasonable question may be raised as to whether the Grand Jury would have acted as it did had the additional facts been adduced before it, the motion to suppress or expunge should be granted. In short, unless the facts on which the censure is based are conclusive, that portion of the presentment cannot survive as to the individual. It must be kept in mind that the proceeding is not a common law trial, either criminal or civil in nature, but a sui generis hearing arising out of the judicial duty to protect the rights and reputation of the citizen against improper assault by unilateral action of an inquisitorial body.
On the basis of the foregoing, the order appealed from is reversed and the matter is remanded to the Assignment Judge with directions to expunge the portions of the presentment designated (1) and (2) above, and to proceed with the motion to expunge the part designated (3) above, in accordance with the views expressed herein.
WEINTRAUB, C.J. (concurring).
When a grand jury surveys public buildings and institutions and reports its visual observations, for example, that a jail or hospital is overcrowded or undermanned, or that the premises need repairs or replacement, and recommends the appropriation of funds to meet the needs it observed, there is no appreciable problem. But when a grand jury embarks upon an investigation of crime and returns a presentment imputing blame to someone, *403 the situation is dramatically different. The grand jury then reports, not the product of its sensory observations, but rather findings based upon the testimony of others. I can think of no fact-finding procedure more hostile to the basic tenets of the judicial process than the procedure of a grand jury. It meets in secret; it conducts its hearings unilaterally; there is no opportunity in the individual affected to cross-examine witnesses against him or to produce evidence in his favor.
It is no palliative to have the assignment judge examine the secret record to see if the evidence warrants the aspersion. A record made in the manner I have described can never warrant a finding of a final character. We must remember that with respect to indictments for crime, the grand jury makes no finding of guilt. Its single role is to determine whether there is sufficient cause to justify a trial, and upon the trial the petit jury must be instructed that the indictment is no evidence whatever of the truth of the charge. The unilateral, secretive process of the grand jury is well calculated to sift charges and to determine which ones warrant trial. Indeed the grand jury was invented to protect the individual against the ordeal of a trial of an arbitrary charge. But when a process thus designed to protect the individual against an unfounded charge is converted into a final trial and results in the condemnation of an individual, the basic purpose of a grand jury is subverted and indeed by a procedure wholly unsuitable as a vehicle for that final decision. It does not matter that the individual is not jailed or fined on the basis of the report; public censure by an agency of the judiciary is punitive in any practical sense of the word. Nor am I impressed with the thought that public officers should accept such condemnation as the price of their public position. It is unfair to the officer. It is equally unfair to the public, for its confidence in its officials is shaken by a secret process which denies the public an opportunity to learn whether the condemnation accords with the ultimate truth.
*404 Hence I agree that the first two portions of the presentment should be suppressed. For the same reason, I would suppress the third portion as well. Insofar as the presentment states the members of the vice squad "were soon well known to the gambling fraternity and proved an uneffectual means of combatting the gambling element," I find nothing disturbing. But when the grand jury added that "Although their record was shameful, they were allowed to continue in the same capacity," an assault was made upon an individual. Fairly read, it means that some individual with knowledge that "their record was shameful" continued the officers as members of the vice squad. That the word "shameful" might be understood to mean something beyond ineffectiveness simply heightens the condemnation, and that the individual who is the object of the broadside is unnamed merely aggravates the matter since the public may then identify the offender with individuals the grand jury did not have in mind. But wholly apart from the aggravating circumstances to which I have just referred, this portion of the presentment castigates an individual or individuals and should be suppressed. It would be something else if a grand jury, after reporting that it could not find evidence of crime, recommended the authorization of other detectional methods or an investigation by competent agencies of the problem of coping with organized gambling. That kind of a report would be consonant with the nature of grand jury proceedings, but the allocation of blame to an individual who has no forum to dispute the truth of the verdict is something I cannot reconcile with elementary fairness.
I have little difficulty with a report of conditions which the grand jurors themselves observe, as I said at the outset of this opinion. My trouble is with reports of "conditions" which a grand jury finds on the basis of testimony adduced before it. It is difficult to think of all possible reports of "conditions," but I fear there will be few which will not simultaneously reflect upon some identifiable individuals. How can the judiciary strike a fair balance between the *405 public good a presentment may do and the public harm it inflicts by the inferential condemnation of an individual? I am not sure that a reconciliation is possible. The majority opinion holds that if the grand jury record, considered in the light of the proof the individual offers the court, does not conclusively support the imputation, the presentment shall be suppressed. It seems to me that when the individual offers any proof that the imputation is unwarranted, the presentment would probably fall, because it is unlikely that in such circumstances the grand jury testimony, untested by cross-examination, could be accepted as "conclusive." Another possible approach would be a full-blown trial before a court at which the witnesses before the grand jury would be called. I agree that a trial would be an unwarranted burden upon all concerned. Perhaps it would do merely to permit the complaining individual to offer his sworn statement, to be filed with the presentment so that he who looks may read. Finally, it may be that, if there is no feasible solution, we should in such matters join the jurisdictions which hold that a grand jury should indict or be silent. In that connection I would also consider whether the power to present serves as an expedient to refrain from returning indictments which should be found. At the present, I have no confident answer. I think it unnecessary to give one since I believe the third portion of the presentment should be suppressed upon the face of it.
JACOBS and HALL, JJ., vote to reverse and remand but do not join in the court's opinion which they believe may adversely affect the public interest by unduly restricting presentments.
For reversal on majority opinion  Justices FRANCIS, PROCTOR, SCHETTINO and HANEMAN  4.
For reversal on separate opinion  Chief Justice WEINTRAUB  1.
Concurring in the result  Justices JACOBS and HALL  2.